681 F.2d 919
 8 Media L. Rep. 2062
 UNITED STATES of America
v.
Howard L. CRIDEN, Harry P. Jannotti, Louis C. Johanson and
George X. Schwartz.
Appeal of NATIONAL BROADCASTING COMPANY, INC., American
Broadcasting Companies, Inc., CBS Inc. and
Westinghouse Broadcasting Company, Inc.
 No. 82-1038.
 United States Court of Appeals,
Third Circuit.
 Submitted April 5, 1982.
Decided June 30, 1982.
 
 Floyd Abrams, Devereux Chatillon, Melanie Lawson, Cahill, Gordon & Reindel, New York City, Gregory M. Harvey, Marc J. Sonnenfeld, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellants; J. Marshall Wellborn, Jr., Nat. Broadcasting Co., Inc., Ralph E. Goldberg, Allen Shaklan, CBS Inc., Samuel Antar, American Broadcasting Co., Inc., Harlan Rosenzweig, Westinghouse Broadcasting Co., Inc., New York City, of counsel.
 Before SEITZ, Chief Judge, WEIS and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 This matter is before us on an appeal by National Broadcasting Company, Inc., American Broadcasting Companies, Inc., CBS Inc. and Westinghouse Broadcasting Company, Inc. (Broadcasters) from an order of the district court, 501 F.Supp. 854, denying their application for permission to copy all of the videotapes introduced in evidence at the trial of two Philadelphia councilmen, Harry Jannotti and George Schwartz, convicted in one of the ABSCAM cases. This is the second time the broadcasters have appealed from the district court's denial of their application.[1] The first appeal concerned the district court's refusal to give the broadcasters access to any of the tapes for purposes of rebroadcast. This appeal concerns the order of the district court requiring the excision from the tapes of all references to third parties.
 
 
 2
 In Criden I, 648 F.2d 814 (3d Cir. 1981), we rejected each of the various grounds upon which the district court had relied in its ruling that the broadcasters' application should be denied in its entirety. We began our analysis by recognizing and reiterating "the common law right of the public to inspect and copy judicial records", 648 F.2d at 819; we stated that "the right to rebroadcast evidence already publicly available in the same form as that viewed by those present" at a criminal trial would "serve the same values of 'community catharsis,' observation of the criminal trial process, and public awareness" which are served by the open trial guarantee which had been affirmed by the Supreme Court in Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), id. at 822; we noted "that the criminal trial at which the tapes were played was not an ordinary criminal trial" in that defendants were elected public officials convicted of receiving money for acts to be performed by them because of their official positions, and that there was "legitimate public interest in the proceedings far beyond the usual criminal case", id.; and we observed that the "practical limitations" which hamper the public's opportunity to observe trial proceedings personally favored "permitting rebroadcast of the evidence produced at the trial for wider dissemination." Id. We concluded "that there is a strong presumption that material introduced into evidence at trial should be made reasonably accessible in a manner suitable for copying and broader dissemination." Id. at 823. After analyzing in detail all of the factors upon which the district court had relied in rejecting the broadcasters' application, we concluded "that the trial court accorded too little weight to the strong common law presumption of access and to the educational and informational benefit which the public would derive from broadcast of evidence introduced at a trial which raised significant issues of public interest." Id. at 829. Accordingly, we determined that the application of the broadcasters should be granted.
 
 
 3
 We recognized, however, that "courts may appropriately exercise their discretion to deny copying for rebroadcast of evidence which may inflict unnecessary and intensified pain on third parties who the court reasonably finds are entitled to such protection". Id. Because the district court had stated that the tapes "are replete with scurrilous and libelous statements about third parties," we remanded "so that the district court can exercise its discretion to determine whether specific portions of the tapes merit excision." Id. The basis for our remand was specific. We ruled "that the application of the broadcasters should be granted, except for that material which the district court explicitly determines to be impermissibly injurious to third parties." Id. (emphasis added).
 
 
 4
 On remand, the district court recognized that its "sole function (was) to analyze, and if possible eliminate, the threat of harm to legitimate interests of innocent third parties." United States v. Criden, No. 80-166 slip op. at 6 (E.D.Pa.1981) (Memorandum and Order). The broadcasters had suggested to the district court that the references to third parties on the tapes did not create a genuine risk of "serious harm" or "unnecessary and intensified pain" to third parties within the scope of this court's opinion, and urged the court to grant their original motion for permission to copy and broadcast the tapes in their entirety. The district court rejected this suggestion, stating that
 
 
 5
 In the conversations recorded on the tapes, the participants engage in speculation concerning the honesty of various individuals, cast aspersions concerning the intelligence and ability of other individuals, and repeat ancedotal (sic) information about still others and about various business firms, which could readily be interpreted as derogatory.
 
 
 6
 Id. at 7. The district court commented that it would be required "to perform the laborious and time-consuming task of editing the records in question so as to render them fit for public dissemination". Id. at 6. The district court disdained that task. It concluded instead, "I believe it is consistent with the Court of Appeals' directive to excise all such material before permitting wider dissemination of the tapes." Id. at 7. The court thereupon entered the order appealed from authorizing the attorney for the government "to permit the broadcasters to copy and disseminate the video tapes introduced in evidence at the trial of the defendants Schwartz and Jannotti with the exception of all portions of said tapes in which reference is made to persons, firms or corporations not named as defendants in any of the Abscam prosecutions, including so much of the context as refers to such other persons, firms or corporations." United States v. Criden, No. 80-166 (Nov. 20, 1981)(Order).
 
 
 7
 The broadcasters argue that the district court's order directing the removal of all references to any third party, a directive that resulted in the deletion of some 20% of the taped conversations or approximately 77 pages out of a total of over 400 pages of the transcript, nullifies the ruling of this court and was not in compliance with the clear-cut instructions given by this court. We agree. The district court had the obligation to follow our mandate whether or not it agreed with it and whether or not it considered the task "laborious and time-consuming". The hierarchical nature of the federal court system requires no less. Many of the references to third parties which were excised by the government pursuant to the court's order were innocuous and their rebroadcast could not reasonably be considered to "inflict unnecessary and intensified pain on third parties."
 
 
 8
 Although we could remand this matter to the district court again, we have decided that, to expedite our mandate, we will make the necessary judgments ourselves as to whether, and if so which, portions of the testimony should be deleted before the tapes are made available for rebroadcast. Very few of the references to third parties, albeit unflattering, and we may assume false, rise to the level of "intensified pain", as distinguished from mere embarrassment, which would warrant deletion from the tapes themselves, particularly because the transcripts of these conversations are already public information. The broadcasters have filed a copy of the transcript of the tapes which indicates the passages which had been deleted on the tapes. That transcript was unpaginated. We have directed that it be paginated. We will enter an order herewith authorizing the government to permit the broadcasters to copy and disseminate the videotapes with the exception of the portions designated in that order.
 
 
 9
 WEIS, Circuit Judge, concurring and dissenting.
 
 
 10
 As the majority opinion indicates, this appeal revisits much of what we decided in an earlier Criden opinion. The panel was unanimous on the proposition that, when deciding the issue of accessibility, legitimate privacy interests of third parties were to be respected. The majority, however, balanced those interests against the "strong public interest favoring access," employing a "serious harm to third parties" standard as the test. I did not accept the "strong" presumption stance of the majority, and instead suggested that a presumption of access should be only one factor to be considered in deciding whether to permit copying of court exhibits. That proposition apparently has been accepted by the Court of Appeals for the Fifth Circuit in Belo Broadcasting Corp. v. Clark, 654 F.2d 423, 432-33 (5th Cir. 1981).
 
 
 11
 Even under the majority's "strong" presumption test, I cannot agree with the decision to allow most of the derogatory references to third parties to be copied for the purpose of broadcasting. It bears repeating that the right to copy court exhibits, here the videotapes, is not a constitutional one. It is also worth noting that the information adduced in open court has been available for publication. What is thus at stake is the incremental effect of televising offensive comments about people who are totally unconnected with the criminal activity underlying the ABSCAM cases.
 
 
 12
 The objectionable remarks occurred during videotaped conversations of Criden, Jannotti, and Schwartz with F.B.I. agents who were masquerading as representatives of an Arab shiek. Interspersed throughout the sessions was the braggadocio of the trio about their alleged acquaintanceship with, and ability to influence, various individuals in the legal and political world. They also belittled the abilities, character and appearance of various persons, and spoke in crude terms about various business entities in Philadelphia. Most of the commentary would offend persons of ordinary sensibilities and, in some instances, might be considered libelous. However, some statements about third parties were innocuous and harmless.
 
 
 13
 It is conceded that the decision to permit copying is a matter of discretion for the trial judge, guided by general considerations outlined in our earlier opinion. I agree with the majority that the decision of the trial court to delete all references to third parties was broader than necessary. Those comments which were inoffensive need not be banned from copying. However, I share the trial judge's deep concern with the privacy interests at stake here. When the remarks hold third parties up to ridicule, put their integrity and intelligence into question, and are generally demeaning, the presumption in favor of copying disappears. A court should neither assist nor condone large scale republication of malicious gossip.
 
 
 14
 The derogatory comments are largely, if not completely, irrelevant to the case. Although I would not make relevancy the test, its absence is an additional factor that counsels against access for broadcasting. As every trial lawyer knows, irrelevant evidence is often introduced in a trial because it does not adversely affect the parties to the proceeding. That the testimony contains scurrilous comments about a non-litigant may not concern the parties. The judge may not sua sponte question the offending remarks at the time they are uttered because of uncertainty about whether they may be tied in at a later stage of the trial. The victim of the slur is not represented and has no one in court to protect his reputation or even contest the veracity of the statements. But just as with relevancy, if the comments were truthful, it does not follow that copying for broadcasting is justifiable. Absent even minimal testing for truth, widespread dissemination is even more reprehensible.
 
 
 15
 It is unfortunate that such references sometimes appear in the printed media. It is far worse, however, when that testimony is broadcast over a television station for all to see and hear. The differences between the various news media cannot be overlooked.
 
 
 16
 A reporter for the printed media must distill the information he has received when composing a news article. He may omit repetition of the scurrilous remarks, chapter and verse. Inclusion requires positive action on the part of the writer. The reader too, is able to be more discriminating in choosing what he reads, and can more easily avoid offending material. But with a videotape recording, a broadcaster must affirmatively act to edit the material so as to delete the offensive comments. The course of least resistance is to play portions of the tape without interruption. Moreover, the viewer may not as readily block out that which he might otherwise choose not to hear. Consequently, there is an increased likelihood that derogatory comments will be repeated in a television broadcast, and have a greater impact, than in the printed media.
 
 
 17
 The majority believes that no portions of the tape should be excised unless broadcasting would "inflict unnecessary and intensified pain on third parties." "Mere embarrassment" is said to be insufficient. I find that test much too permissive. In my view, unnecessary and unjustified embarrassment is enough reason to spare the uninvolved third parties the unwelcome and undeserved notoriety of a television broadcast. As the court said in In re Application of KSTP Television, 504 F.Supp. 360, 362 (D.C.Minn.1980), "(t)here must then come some point where the public's right to information must bow to the dignity of the individual person."
 
 
 18
 The Supreme Court in Nixon v. Warner Communications, Inc., 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978), recognized the supervisory power of the courts to prevent access to judicial records for improper purposes. Thus, the right to access must be limited to insure that records are not used to promote private spite or public scandal. Id. Since such materials are subject to deletion when they pertain to parties, a fortiori, a less stringent standard should be applicable when the matter refers to persons not involved in the litigation. The necessity for such a distinction is demonstrated by the plight of the innocent third parties in this appeal. No one has appeared on their behalf-the United States Attorney's Office has disclaimed any interest in the appeal, the defendants evinced no concern, and, as a result, the broadcast networks have presented their case ex parte.
 
 
 19
 The standard imposed by the majority also introduces an additional element of subjectivity. Whether a concededly derogatory remark would inflict "intensified pain" upon a particular third party depends upon the temperament of the individual. One might question why non-involved parties should be required to suffer any pain. A rule that uniformly expunges derogatory material eliminates the necessity of making such judgments. By releasing all the offensive remarks, the court gives them a currency far beyond what they merit and concomitantly adds to the indignity suffered by the victims. The court should not be a party to such violations of individual privacy.
 
 
 20
 When the issue is viewed in the proper perspective, it warrants the conclusion that even a "strong" presumption in favor of access is overcome in the circumstances presented here. As noted earlier, the information is generally available, has no relevancy to the matters involved in the case, and pertains to unrepresented nonlitigants. The references are maligning and demeaning utterances, whose only value is that of sensationalism. In my view, these factors defeat the common law presumption allowing access to copy for broadcast purposes. I would therefore delete all references to third parties which could cause unnecessary embarrassment.[1]
 
 
 
 [1]
 In order to differentiate the various opinions which have been appealed under the caption United States v. Criden, we will designate them as follows: United States v. Criden, In Re Application of National Broadcasting Company, Inc., 648 F.2d 814 (3d Cir. 1981) (Criden I ) (appeal from the district court's denial of the application of the broadcasters for leave to copy video and audio tapes); United States v. Criden, 675 F.2d 550 (3d Cir. 1982) (Criden II ) (appeal from the district court's orders denying access to the transcript to a suppression hearing and closing another hearing to the public and press). In another related appeal, this court reviewed the action of the district court which set aside the verdict of the jury and granted the motions of defendants for judgment of acquittal. United States v. Jannotti, 673 F.2d 578 (3d Cir. 1982) (en banc)
 
 
 [1]
 The majority has directed that the tapes be redacted by deleting the portions of the conversations on the following pages of the transcript:
 a. Page 223, line 24 to page 224, line 10;
 b. Page 237, line 12 to page 238, line 4;
 c. Page 250, line 20 to page 252, line 5;
 d. Page 253, line 1 to page 253, line 17;
 I would also delete:
 a. Page 11, lines 9 and 10;
 b. Page 66, lines 2 and 3, 11 and 12 and 23;
 c. Page 67, lines 1-17;
 d. Page 127, lines 3-8;
 e. Page 178, line 8 to page 179, line 8;
 f. Page 184, line 16 to page 189, line 11;
 g. Page 217, lines 1-3;
 h. Page 235, line 21 to page 238, line 4;
 i. Page 240, line 1 to line 8;
 j. Page 248, line 5 to page 254, line 24;
 k. Page 282, line 4 to page 283, line 8;
 l. Page 313, line 15 to page 314, line 20.