776 F.2d 1104
 54 USLW 2285, 12 Media L. Rep. 1345
 UNITED STATES of America
v.
SMITH, William T., Jr.
Patriot News Company (Limited Intervenor), Appellant, No. 85-5111.
UNITED STATES of America
v.
STONEMAN, Alan R.
Patriot News Company (Limited Intervenor), Appellant, No. 85-5112.
 Nos. 85-5111, 85-5112.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 7, 1985.
Decided Nov. 6, 1985.
 
 John C. Sullivan (argued), Nauman, Smith, Shissler & Hall, Harrisburg, Pa., for appellant Patriot News Co.
 James J. West, David C. Shipman (argued), U.S. Atty's. Office, Harrisburg, Pa., for U.S.
 Thomas Colas Carroll (argued), John Rogers Carroll, Carroll & Carroll, Philadelphia, Pa., for William T. Smith, Jr.
 John C. Uhler, Uhler, DeLuca & Dorney, York, Pa., for Alan R. Stoneman.
 Before ALDISERT, Chief Judge, and STAPLETON and MANSMANN, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 This is an appeal from a final order denying the press access to a portion of a bill of particulars under seal pursuant to court order, 602 F.Supp. 388.[1] While we cannot agree with the district court's legal analysis, we affirm its decision because we conclude that the risk of serious injury to third parties from disclosure outweighs the interest of the public in access to this limited segment of the bill of particulars.
 
 I. The Proceedings Below
 
 2
 On October 22, 1984, a grand jury indicted two corporations and five individuals, including William T. Smith, Jr. and Alan R. Stoneman, charging them with violations of the Interstate Transportation in Aid of Racketeering and Mail Fraud statutes, 18 U.S.C. Secs. 1341, 1952(a)(3), and with conspiracy to violate those statutes, 18 U.S.C. Sec. 371. The indictment alleged that defendants engaged in a scheme to obtain Federal Insurance Contribution Act tax recovery contracts from state and local government entities on a no-bid basis by attempting to corruptly influence public officials and public employees.
 
 
 3
 Defendants Smith and Stoneman, pursuant to Federal Rule of Criminal Procedure 7(f), separately filed motions for bills of particulars requesting, inter alia, that the government identify the unindicted co-conspirators referred to in the indictment. On January 8, 1985, while reserving decision on all other aspects of the Rule 7(f) motions, the court below simultaneously ordered identification of the unindicted co-conspirators and granted a government request for a protective order regarding their names. The dispositive portion of the January 8 order stated:
 
 
 4
 1. The Government shall provide to Defendants Stoneman and Smith the names of unindicted co-conspirators referred to in p 2, Count 1 of the indictment in this case.
 
 
 5
 2. Information provided by the Government pursuant to p 1 above shall not be disclosed by the Defendants or their counsel except upon leave of Court.
 
 
 6
 3. If information provided by the Government pursuant to p 1 above is filed with the Clerk, the Clerk of Court shall seal the document(s) containing such information.
 
 
 7
 4. The provisions of this order relating to confidentiality of the names of unindicted co-conspirators may be modified by the Court on application of any interested person or body upon notice and for good cause shown.
 
 
 8
 On January 11, 1985, the government filed a list of names in response to this order and the Clerk placed the document under seal. Soon thereafter, the court granted motions by the Patriot News Company and Philadelphia Newspapers, Inc. to intervene in order to apply to the district court for modification of the January 8 protective order. An evidentiary hearing on the motions to modify was held on January 29th, and after briefing and argument, the court, on February 13th, refused to lift the protective order.
 
 
 9
 The trial judge filed extensive findings of fact and conclusions of law explaining the reasons for his decision. Among the significant facts so found are the following:
 
 
 10
 11. On January 11, 1985, the Government filed a two-page document under seal with the Clerk of Court setting forth the required information in compliance with the Court's order.
 
 
 11
 12. The sealed document contains the names of persons who, in the opinion of the United States Attorney, are unindicted co-conspirators in this case or who could conceivably be considered as unindicted co-conspirators due to their alleged involvement in events included in the conspiracy.
 
 
 12
 * * *
 
 
 13
 * * *
 
 
 14
 14. The persons named in the sealed documents have not been found by a grand jury to be unindicted co-conspirators.
 
 
 15
 15. All of the individuals named in the sealed document are currently under active investigation by the Federal Bureau of Investigation in the Middle District and Western District of Pennsylvania and by the Federal Grand Jury in the Middle District of Pennsylvania.
 
 
 16
 16. The FBI's investigation will probably continue for six to nine months.
 
 
 17
 17. As of January 29, 1985, the Government had not made any final decision as to whether or not any of the individuals named in the sealed document will be indicted.
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 19. Some of the individuals identified in the sealed document are elected officials and public employees of the Commonwealth of Pennsylvania.
 
 
 21
 * * *
 
 
 22
 * * *
 
 
 23
 21. The Government has not publicly identified any of the persons named in the sealed document as unindicted co-conspirators during any proceeding in this case or in any other document filed with the Court.
 
 
 24
 22. The Government's opinion concerning the names of persons who are or who could conceivably be considered as unindicted co-conspirators in this case is not currently in the public domain.
 
 
 25
 * * *
 
 
 26
 * * *
 
 
 27
 27. The disclosure of the names of the unindicted co-conspirators to the Patriot News Company and Philadelphia Newspapers, Inc. would subject the unindicted co-conspirators to publicity stigmatizing them as having been named by the United States Attorney as alleged participants in the conspiracy alleged in the indictment at a time when they have not been charged and would have no judicial forum in which to defend against the accusations.
 
 
 28
 28. The publicity generated from release of the names to the media would probably subject the persons named therein to embarrassment, annoyance, ridicule, scorn, traduction, and loss of reputation in the community.
 
 
 29
 Following Seattle Times Co. v. Rhinehart, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), the district court concluded that the government need not show a compelling governmental interest and a narrowly tailored judicial response to support continued ensealment of the list of names. Rather, it found that the document could remain sealed so long as the government showed "good cause" therefor. With respect to the issue of whether good cause existed, the court first observed that release of the list would not prejudice the defendant's right to a fair trial and that the evidence regarding a possible adverse impact on the government's continuing investigation was "unpersuasive." It then concluded, however, that the risk of serious injury to the persons named on the list in the event it was made public outweighed "any common law or First Amendment right of access to the list." The court went on to explain:
 
 
 30
 Release of the list of names of unindicted co-conspirators clearly would invade the privacy rights of those individuals. The list constitutes an informal accusation of wrongdoing by the government to which the unindicted co-conspirators would have no meaningful opportunity to respond. Unlike the Defendants in this case who have been formally charged and have had or will have the opportunity formally to respond to the charge against them or to have their guilt or innocence with respect to the charges formally determined by a jury, the unindicted co-conspirators have no such opportunity.
 
 
 31
 The trial judge concluded his opinion by holding, in the alternative, that the potential for serious injury to the named individuals was sufficient to meet not only the "good cause" standard of Seattle Times but also the "compelling interest"-"narrowly tailored" response standard of Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). The court expressly determined that "no less restrictive alternative exists to continued ensealment of the information which would protect the privacy interests of these individuals" and stressed the limited intrusion upon the public's interest in access to information concerning the case:
 
 
 32
 The Court's ensealing order is narrowly tailored to serve these interests because it only precludes access to one document, does not prevent the dissemination of the information contained therein if gathered from other sources and will only be maintained so long as necessary to protect the viability of these interests, that is, so long as the individuals named in the sealed document have not been indicted in connection with the conspiracy charged in this case.
 
 II. The First Amendment Right of Access
 
 33
 The public's right of access to at least some judicial proceedings is now beyond peradventure. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), although lacking a majority opinion, firmly established a First Amendment right to open criminal trials. Chief Justice Burger, writing for a plurality of three, primarily relied on the history of open criminal trials to support a First Amendment right of access to such trials. Tracing the evolution of the modern criminal trial from before the Norman Conquest, he found that "the historical evidence demonstrates conclusively that at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open. This is no quirk of history; rather, it has long been recognized as an indispensable attribute of an Anglo-American trial." Id. at 569, 100 S.Ct. at 2823. The Chief Justice then elaborated upon the functional value of open trials in channeling the societal response to crime:Civilized societies withdraw both from the victim and the vigilante the enforcement of criminal laws, but they cannot erase from people's consciousness the fundamental, natural yearning to see justice done--or even the urge for retribution. The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is "done in a corner [or] in any covert manner."
 
 
 34
 Id. at 571, 100 S.Ct. 2824, quoting the 1677 Concessions and Agreements of West New Jersey, reprinted in Sources of Our Liberties 188 (R. Perry ed. 1959). Thus, the Chief Justice continued, "To work effectively, it is important that society's criminal process 'satisfy the appearance of justice,' Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954), and the appearance of justice can best be provided by allowing people to observe it." Richmond Newspapers, 448 U.S. at 571-72, 100 S.Ct. at 2824-25.
 
 
 35
 Justice Brennan, in concurrence, argued that the First Amendment "embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a structural role to play in securing and fostering our republican system of self-government." Id. at 587, 100 S.Ct. at 2833 (emphasis in original). The right of access, Justice Brennan continued, has particular weight when claimed in the context of "an enduring and vital tradition of public entree to particular proceedings or information," and the importance of access to "a particular government process" must be measured "in terms of that very process." Id. at 589. To Justice Brennan, "Public access is essential, therefore, if trial adjudication is to achieve the objective of maintaining public confidence in the administration of justice." Id. at 595, 100 S.Ct. at 2837.
 
 
 36
 Two years after Richmond Newspapers, in Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the Court held that a mandatory closure rule for trials involving specified sexual offenses where the victim was less than eighteen years old violated the First Amendment. Justice Brennan, now writing for the majority, noted that "two features of the criminal justice system, emphasized in the various opinions in Richmond Newspapers, together serve to explain why a right of access to criminal trials in particular is properly afforded protection by the First Amendment." Globe Newspaper, 457 U.S. at 605, 102 S.Ct. at 2619 (emphasis in original). First, criminal trials have a history of openness, and second, "the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole." Id. at 606, 102 S.Ct. at 2619. "In sum," Justice Brennan concluded, "the institutional value of the open trial is recognized in both logic and experience." Id. at 606, 102 S.Ct. at 2619. Significantly, in dissent, Chief Justice Burger--joined by Justice Rehnquist, the lone dissenter in Richmond Newspapers --adopted the analysis for First Amendment access cases promulgated by Justice Brennan in Richmond Newspapers:
 
 
 37
 The proper mode of analysis to be followed in determining whether there is a right of access was emphasized by JUSTICE BRENNAN:
 
 
 38
 "As previously noted, resolution of First Amendment public access claims in individual cases must be strongly influenced by the weight of historical practice and by an assessment of the specific structural value of public access in the circumstances."
 
 
 39
 Globe Newspaper, 457 U.S. at 614, 102 S.Ct. at 2624 (Burger, C.J., dissenting) (quoting Richmond Newspapers, 448 U.S. at 597-98, 100 S.Ct. at 2838-39 (Brennan, concurring)). Chief Justice Burger dissented because he believed that the public has historically been excluded from trials arising from sexual assaults.
 
 
 40
 The standard for closing criminal proceedings was elucidated by the Court in Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), which extended the right of access to the voir dire examination of potential jurors for criminal trials. The Court, as it had done in Richmond Newspapers, traced the history of public trials and found the process presumptively open. Although the Court did not absolutely preclude closed proceedings, it promulgated a high standard for closing:
 
 
 41
 In Globe Newspaper Co. v. Superior Court ... we stated that:
 
 
 42
 "[T]he circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one. Where ... the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." Id., at 606-607 [102 S.Ct. at 2619-20]....
 
 
 43
 The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.
 
 
 44
 Press-Enterprise, 464 U.S. at 509-10, 104 S.Ct. at 824 (citations omitted).
 
 
 45
 This court has also addressed the question of the First Amendment right of access to judicial proceedings. In United States v. Criden, 675 F.2d 550 (3d Cir.1982) ("Criden II "), we applied the principles of Richmond Newspapers to an order precluding access to a pretrial suppression hearing in a criminal case. Because the "six societal interests" identified by the Supreme Court as mandating a strong presumption of access to criminal trials[2] were "also present in the context of pretrial criminal proceedings," Criden II, 675 F.2d at 556, we found a First Amendment right of access to such proceedings and reversed the district court in part for its failure to "consider alternatives to closure and explicitly state its reasons on the record for rejecting such alternatives." Id. at 560.[3]
 
 
 46
 We have also found that these societal interests and a long history of public access mandated recognition of a First Amendment right of access to civil trials. Publicker Industries, Inc. v. Cohen, 733 F.2d 1059 (3d Cir.1984). We there held that "to limit the public's access to civil trials there must be a showing that the denial serves an important governmental interest and that there is no less restrictive way to serve the governmental interest." Id. at 1070.
 
 III. The Common Law Right of Access
 
 47
 Before addressing the pertinence of these First Amendment cases in the circumstances now before the court, it is helpful to note another closely related line of cases. These cases recognize a federal common law right of access to certain documents in the possession of a district court. In United States v. Criden, 648 F.2d 814 (3d Cir.1981) ("Criden I "), this court overturned a district court order denying the request of television networks to copy certain of the Abscam video tapes that had been placed in evidence. We there recognized a common law right of access to trial evidence and did not reach the First Amendment issue. We noted, however, that the Supreme Court's "analyses in Richmond Newspapers of the public's right to an open trial provide strong support" for the conclusion we reached. Criden I, 648 F.2d at 821-22. We held that
 
 
 48
 when the common law right of access is buttressed by the significant interest of the public in observation, participation, and comment on the trial events, we believe that the existence of a presumption of release is undeniable.... [W]e hold that there is a strong presumption that material introduced into evidence at trial should be made reasonably accessible in a manner suitable for copying and broader dissemination.
 
 
 49
 Id. at 823.
 
 
 50
 In Criden I, the district court had justified its denial of access to the tape in part based on a finding that they were "replete with scurrilous and libelous statements about third parties" and in part based on a belief that the court should not "condone, much less affirmatively aid, the large-scale republication of such material." United States v. Criden, 501 F.Supp. 854, 862-63 (E.D.Pa.1980). On appeal, we recognized that reputational and privacy interests of third parties might outweigh the strong presumption of public access but declined to sanction a withholding of the entire tape on that ground. We remanded so that the district court might "balance the strong public interest favoring access against legitimate privacy concerns of third parties" and determine "whether actual broadcast of videotape material is so likely to cause such serious harm to third parties that excision ... [would be] warranted." Criden I, 648 F.2d at 829.
 
 
 51
 On remand, the district court ordered deletion of all references to third parties and when the case reached us once again, we again reversed. United States v. Criden, 681 F.2d 919 (3d Cir.1982) ("Criden III "). We held that redaction could only be justified by a risk of serious harm to third parties, not by the potential for "mere embarrassment." Id. at 922. To expedite disposition of the matter, we performed the redaction process ourselves.
 
 
 52
 The teachings of Criden I and Criden III were recently applied by this court in the context of a press demand for access to transcripts of tape recordings which had been used by the jury in a criminal trial but not admitted into evidence. United States v. Martin, 746 F.2d 964 (3d Cir.1984). In Martin, we addressed the issue of "whether the strong presumption in favor of access applied to judicial records and documents." Id. at 968. We answered in the affirmative, based on the following reasoning:
 
 
 53
 The strong presumption established in Criden I was based on two factors: the common law right of access to judicial records, and the public interest in "observation, participation, and comment...." 648 F.2d at 823. We find that both of these factors support a strong presumption in favor of access to these transcripts. The common law right of access is not limited to evidence, but rather encompasses all "judicial records and documents," Warner Communications, 435 U.S. at 597, 98 S.Ct. at 1311-1312. It includes "transcripts, evidence, pleadings, and other materials submitted by litigants...." Comment, All Courts Shall Be Open: The Public's Right to View Judicial Proceedings, 52 Temple L.Q. 311, 337-38 (1979). The public interest in monitoring judicial proceedings also supports a presumption in favor of access....
 
 
 54
 Martin, 746 F.2d at 968. Because we determined, on nonconstitutional grounds, that the trial court had erred, we did not reach the question of whether there was a First Amendment right of access to the materials in that case. Id. at 967 n. 3.
 
 IV. The Applicable Standard
 
 55
 The court below referred to these two lines of cases in its search for the legal standard it should apply in deciding the newspapers' application for access to the sealed list of names. It concluded, however, that neither the "strong presumption" test of Criden and Martin nor the "overriding interest"--"narrowly tailored" response standard of Press-Enterprise was apposite. This conclusion was based on Seattle Times Co. v. Rhinehart, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), in which the Supreme Court sustained a protective order preventing dissemination of information obtained in civil discovery issued after application of a "good cause" standard like that found in Federal Rule of Civil Procedure 26(c). The district court viewed the bill of particulars in this case as being more like the civil discovery involved in Seattle Times than the testimony, tapes, and documents involved in Richmond Newspapers, Press-Enterprise, Criden, Martin, and Publicker.
 
 
 56
 While Seattle Times suggests that the strong presumption in favor of public access to trial evidence does not apply to all documents filed with a court clerk, it does not control here. We conclude that the First Amendment right of access recognized in Richmond Newspapers and the common law right of access recognized in Criden, Martin, and Publicker extend to bills of particulars because we think them more properly regarded as supplements to the indictment than as the equivalent of civil discovery.
 
 
 57
 Historically and functionally, the bill of particulars is closely related to the indictment. Bills of particulars, relative to indictments, have a brief history. Nevertheless, that history closely ties the bill of particulars to the indictment. Originally, indictments set forth the accusation in great detail and there was no need for supplementation. The modern trend, however, has been towards more skeletal accusations combined with procedures providing access to the omitted details if the defense has a legitimate need for them. WHARTON, CRIMINAL PROCEDURE, Sec. 355 (12th ed. 1975). Federal Rule of Criminal Procedure 7(f) provides the opportunity for such access. That rule authorizes the court to "direct the filing of a bill of particulars" (emphasis added). This is in marked contrast to the provisions of Rule 16, which authorize the court to direct that the government "furnish to the defendant " certain specified items of discovery. In this context, we believe Rule 7(f) provides some evidence that bills of particulars were regarded by the drafters of the rules as supplements to the indictment[4] rather than as pretrial discovery.
 
 
 58
 Turning to the functions performed by a bill of particulars, we again find them more akin to the functions of an indictment than to discovery. While it is true, as appellant stresses, that a bill of particulars, like discovery, provides information to the defendant for use in his or her defense, the same can be said of the indictment. A bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government's investigation. See, e.g., United States v. Hill, 589 F.2d 1344, 1352 (8th Cir.); cert. denied, 442 U.S. 919, 99 S.Ct. 2843, 61 L.Ed.2d 287 (1979); 8 MOORE'S FEDERAL PRACTICE p 7.06 (2nd ed, 1985 Rev.). Rather, it is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his own investigation. United States v. Manetti, 323 F.Supp. 683, 696 (D.Del.1971). More importantly, a bill of particulars, like the indictment, is designed to define and limit the government's case. As with the indictment, there can be no variance between the notice given in a bill of particulars and the evidence at trial. United States v. Neff, 212 F.2d 297, 309 (3d Cir.1954); United States v. Murray, 297 F.2d 812 (2d Cir.) cert. denied 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962). Because bills of particulars thus set the parameters of the government's case, we think public access to them serves the same societal interests served by access to the charging documents.
 
 
 59
 We now turn to determine, employing the historical and structural analysis mandated by Richmond Newspapers, Globe Newspaper, and Press-Enterprise, whether there is a First Amendment right of access to indictments. Although those cases concerned access to judicial proceedings, no reason occurs to us why their analysis does not apply as well to judicial documents, as we previously so applied it in Martin, 746 F.2d at 968. See also Associated Press v. United States District Court, 705 F.2d 1143, 1145 (9th Cir.1983). As with open criminal trials, the institutional value of public indictments "is recognized in both logic and experience." It has long been the law that "criminal proceedings cannot be said to be brought or instituted until a formal charge is openly made against the accused, either by indictment presented or information filed in court ..." Post v. United States, 161 U.S. 583, 587, 16 S.Ct. 611, 613, 40 L.Ed. 816 (1896), citing Virginia v. Paul, 148 U.S. 107, 119, 121, 13 S.Ct. 536, 540, 541, 37 L.Ed. 386 (1893); Rex v. Phillips, Russ. & Ry 369 (1818); Regina v. Parker, Leigh & Cave 459 (1864); S.C. 9 Cox.Crim.Cas. 475. The requirement of Rule 6(f) that an indictment or information be presented in open court reflects the common law tradition:
 
 
 60
 When the jury have made these indorsements on the bills, they bring them publicly into court, and the clerk of the peace at sessions, or clerk of assize on the circuit, calls all the jurymen by name, who severally answer to signify that they are present, and then the clerk of the peace or assize asks the jury whether they agreed upon any bills, and bids them present them to the court, and then the foreman of the jury hands the indictments to the clerk of peace or clerk of assize.
 
 
 61
 1 Chitty on Crim.Law 324, quoted in Renigar v. United States, 172 F. 646, 648 (4th Cir.1909). See also 4 Blackstone's Commentaries 306 ("And the indictment when so found is publicly delivered into court"). Such a presentment in open court may even be a prerequisite to a valid indictment. Renigar, 171 F. at 658. While indictments so presented are sometimes temporarily sealed by the court, this is the exception rather than the rule and occurs only when there is an overriding concern such as a well-grounded fear of flight by the accused to avoid apprehension.
 
 
 62
 This historic tradition of public access to the charging document in a criminal case reflects the importance of its role in the criminal trial process and the public's interest in knowing its contents. It sets forth the charge or charges to be tried and, as we noted supra, thereby establishes the general parameters of the government's case. Knowledge of the charge or charges is essential to an understanding of the trial, essential to an evaluation of the performance of counsel and the court, and, most importantly, essential to an appraisal of the fairness of the criminal process to the accused.
 
 
 63
 Because of our historic experience and the societal interest served by public access to indictments and informations, we hold that such access is protected by the First Amendment and the common law right of access to the judicial process. Furthermore, our review of the history and structural importance of bills of particulars convinces us that the same conclusion in favor of public access is appropriate.
 
 
 64
 Since access to bills of particulars is protected by the First Amendment, as well as the common law right of access to the judicial process, we need not reach the issue of whether the standard for overcoming the common law "strong presumption" of access is the same as the standard for overriding First Amendment protection. Since a First Amendment right of access is involved, the trial court ensealment of the list of names can be sustained only if it "is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." Press-Enterprise, 464 U.S. 501, 510, 104 S.Ct. at 824 (1984) (quoting Globe Newspaper, 457 U.S. 596, 607, 102 S.Ct. at 2620 (1982)).
 
 
 65
 Before applying the Press-Enterprise standard, we note one further point. The Supreme Court has recognized that the need to protect individual privacy rights may, in some circumstances, rise to the level of a compelling governmental interest and defeat First Amendment right of access claims. Although in both Globe Newspaperand Press-Enterprise, the Court held that the First Amendment right outweighed the asserted privacy rights, in both cases it indicated that its decision turned on the breadth of the closure order rather than on the lack of compellingness of the privacy rights. In Globe Newspaper, the Court recognized that "the protection of minor victims of sex crimes from further trauma and embarrassment" is a compelling interest, but struck down the mandatory closure law because the significance of that interest may vary according to the circumstances of each case. 457 U.S. at 607-10, 102 S.Ct. at 2620-22. Similarly, in Press-Enterprise, the Court found that the privacy interests of prospective jurors being questioned on voir dire may in some instances meet the high standard for closure. 464 U.S. at 511, 104 S.Ct. at 825. See also id. at 519, 104 S.Ct. at 829 (Stevens, concurring) ("As the Court recognizes, the privacy interests of jurors may in some circumstances provide a basis for some limitation on the public's access to voir dire.").
 
 
 66
 We have also recognized, in Criden I and Criden III, that reputational interests may outweigh the public's common law right of access. Furthermore, our Criden decisions rely in part on Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), in which the Court, although finding that "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents," id. at 597, 98 S.Ct. at 1311, observed that the right of access may at times give way to privacy rights:
 
 
 67
 Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case."
 
 
 68
 Id. at 598, 98 S.Ct. at 1312, quoting In Re Caswell, 18 R.I. 835, 836, 29 A. 259 (1893). Thus, whether appellant's right of access is grounded on the First Amendment right of access to judicial proceedings or on the common law right of access to judicial documents, privacy rights may outweigh the public's interest in disclosure.
 
 V. Application of the Standard
 
 69
 Because the government is strictly held to the position taken in a bill of particulars, there is an incentive for the prosecutor to draft the bill in a manner that will enable him or her to retain the greatest amount of freedom and flexibility consistent with the existence of a court order requiring that such a document be filed. This incentive is undoubtedly responsible for the fact that the bill involved in this case set forth a list of names including not only those "persons who, in the opinion of the United States [Attorney], are unindicted co-conspirators in this case," but also those persons who, in his opinion, "could conceivably be considered as unindicted co-conspirators due to their alleged involvement in events included in the conspiracy." This approach seriously exacerbated the risk of injury which is inherent in any publication of a list of unindicted co-conspirators.
 
 
 70
 If published, the sealed list will communicate to the general public that the named individuals, in the opinion of the chief federal law enforcement official of the District, are guilty, or may be guilty, of a felony involving breaches of the public trust. This broad brush assertion will be unaccompanied by any facts providing a context for evaluating the basis for the United States Attorney's opinion with respect to any given individual. When one adds to this that the United States Attorney's opinion was formed on the basis of an investigation that had not yet reached the point where he was willing to make a decision on whether to prosecute, it becomes apparent that the risk of serious injury to innocent third parties is a grave one. Finally, as the trial judge noted, the named individuals have not been indicted and, accordingly, will not have an opportunity to prove their innocence in a trial. This means that the clearly predictable injuries to the reputations of the named individuals is likely to be irreparable.
 
 
 71
 The individuals on the sealed list are faced with more than mere embarrassment. It is no exaggeration to suggest that publication of the list might be career ending for some. Clearly, it will inflict serious injury on the reputations of all. In some instances, there may be truth to the prosecutor's accusation. On the other hand, given the stage at which his opinion was formed and his "conceivably may have" standard, it is virtually certain that serious injury will be inflicted upon innocent individuals as well. In these circumstances, we have no hesitancy in holding that the trial court had a compelling governmental interest in making sure its own process was not utilized to unnecessarily[5] jeopardize the privacy and reputational interests of the named individuals.
 
 
 72
 We further hold that the approach taken by the trial judge was narrowly tailored to serve these compelling interests. Promptly after the filing of the motions for bills of particulars, he severed the proceedings on the requests for identification of unindicted co-conspirators from the proceeding on the remaining requests contained in the motion. The order prohibiting public access was limited solely to the government's list of co-conspirators; all other aspects of the proceedings remained in the public domain. In addition, as the trial judge made clear, his order did not prevent dissemination of the listed names if it was obtained from any other source. Finally, the judge advised in advance that he would lift the protective order in the event the listed individuals were indicted. Appellant has suggested no way in which the trial judge could have been more restrained and still have provided protection against the threatened injuries. Moreover, we perceive none.
 
 
 73
 In reaching these conclusions, we have been mindful of the fact that the list contains the names of some individuals who are public officials and some who are public employees. We, of course, agree with appellee that the public has a substantial interest in the integrity or lack of integrity of those who serve them in public office. We do not think that the subject matter of the particular information to which access is sought can control the issue before us, however. A similar argument was made to this court in the Martin case based on a comment in Criden I concerning the widespread interest aroused by Abscam. Judge Higginbotham, writing for the court, responded that although "the extraordinary public interest in Abscam was noted in Criden I, ... we do not believe the court intended that this should be an important factor in the balancing process." 746 F.2d at 696. Moreover, this court in Criden I and II, despite the extraordinary public interest in the subject matter of the tapes, sanctioned a record redaction similar to the one in this case in the interest of protecting the privacy interests of third parties.
 
 
 74
 Appellant's argument is flawed for a more fundamental reason, however. As we have explained, the underpinnings of the First Amendment and common law rights of access are historical experience and societal utility. When resolving issues involving these rights, the Supreme Court has not examined whether there has been a tradition of access with respect to information of the particular character involved or whether that information is of significant public interest. Rather, it has inquired whether there has historically been public access to this particular part of the judicial process and whether access to that portion of the process will significantly enhance public understanding and appreciation of the judicial process or improve the process itself. If the answers to these questions are in the affirmative, the Court has recognized and protected the public interest involved by precluding closure in the absence of a compelling, countervailing governmental interest.
 
 VI. CONCLUSION
 
 75
 The trial judge in this case was sensitive to the First Amendment interests involved. He followed precisely the notice, hearing and other procedural protections we imposed in Criden II as a prerequisite to closure and concluded this process by making detailed findings that explain the overriding interests which he perceived to be in jeopardy and the reasons why no approach less intrusive on First Amendment interests could adequately protect those interests. The overriding interests that the trial judge acted carefully to protect were interests of a character that this court has previously recognized as worthy of protection in a similar context--the reputational and privacy interests of third parties. Since we agree that under the facts of this case, disclosure would almost certainly result in extremely serious, irreparable, and unfair prejudice to those included in the United States' Attorney's broadly conceptualized list of unindicted co-conspirators, we find no error. The order of the district court denying access to the sealed portion of the bill of particulars will be affirmed.
 
 
 76
 MANSMANN, Circuit Judge, concurring.
 
 
 77
 I agree with the majority that both common law and First Amendment rights of access are implicated by the trial court's decision to seal the bill of particulars. I also agree that the list of unindicted co-conspirators contained in that bill may properly remain sealed, albeit for reasons different than those articulated by the district court and by the majority. I write separately to emphasize what for me are the important factors weighing in favor of nondisclosure.
 
 I.
 
 78
 At the outset I note that the First Amendment right of access, outlined in detail by the majority, requires as a general rule the disclosure of bills of particulars.[1] I am troubled by the apparent suggestion in the majority opinion that whenever an unindicted co-conspirator is threatened with serious injury to reputation or career, the sealing of the offending bill of particulars is warranted. Such a principle would effectively vitiate the general rule of public access to such documents.
 
 
 79
 In my view, the argument could be made of most individuals that their reputations would be seriously damaged and their careers placed in jeopardy by the publication of their names in a list of unindicted co-conspirators identified by the government in a bill of particulars. I am unwilling to assume that the reputations and careers of public officials are any more deserving of protection than those of the private individual. I also am unwilling, however, to adopt an approach which would promote the routine sealing of bills of particulars. Instead, I contend that potential damage to reputation and career, like "mere embarrassment," does not constitute a "compelling governmental interest" justifying limitation of First Amendment public access rights.
 
 
 80
 Certainly, criminal trials are not permissibly closed merely because an individual's reputation or career is threatened. The public's guarantee of access cannot be so lightly infringed. Similarly, the First Amendment right of public access requires more than damage to career or reputation before a bill of particulars may be sealed. A bill of particulars defines the indictment and limits the prosecution. Its purposes, to promote an accused's right to adequate notice of the charge and to protect a defendant from a second prosecution for an inadequately described offense, 1 Orfield's Criminal Procedure Under the Federal Rules Sec. 7:129 (2d ed. 1985), are founded on constitutional protections for the accused and integrally related to the public's right to open trials. Just as the public is guaranteed the right to know the charges against an accused by way of an open indictment, it also must be assured the right to that same information when the government is permitted to utilize a bill of particulars in addition to an indictment.[2] The oft-times unfortunate by-products of public access must be tolerated because the historical role and the function of the bill of particulars dictate the application of the First Amendment. The right of access cannot be thwarted by a general rule permitting closure whenever the effects of that access become uncomfortable.
 
 II.
 
 81
 In addition to the general First Amendment presumption of disclosure, the need for public access is heightened by the particular facts of this case. The indictment underlying this appeal charges the defendants with violations of federal conspiracy, fraud, racketeering and bribery laws in a scheme to obtain lucrative contracts from Pennsylvania state and local governments through corruption of public officials. The list of unindicted co-conspirators at issue includes the names of public employees and elected officials, who cannot claim a right of privacy with respect to the manner in which they perform their duties. Where a criminal trial allegedly involves violations of the public trust by government officials, the public's need to monitor closely the judicial proceedings is perforce increased.
 
 
 82
 In United States v. Martin, this court held that extraordinary public interest is not a prerequisite to disclosure under the common law right of access. 746 F.2d 964, 969 (3d Cir.1984). Conversely, extraordinary public interest cannot be considered a factor favoring nondisclosure in a compelling governmental interest determination. The fact that heightened public concern or widespread media coverage will contribute to the embarrassment, ridicule, scorn, or damage to the careers and reputations of public officials cannot contribute to a decision to seal the offending document for the purposes of protecting those officials. Rather, the nature of the offense as well as the public character of the unindicted co-conspirators provide additional support for the public's right of access to the bill of particulars.
 
 
 83
 In the context of this case, it is all the more important that the public know the precise crimes of which the defendants stand accused. It is all the more important that the public be equipped to monitor the prosecution and that it be informed of the judicial proceedings. Allegations of corruption, of bribery and fraud, of violation of the public trust are matters of grave concern to a representative government. Where such charges result in a criminal trial of alleged perpetrators, the constitutionally-protected interest in a public trial is not lessened but becomes all the more paramount.
 
 III.
 
 84
 Despite my grave concern for the public's First Amendment right of access to bills of particulars as a general matter and especially in the context of this case, I nevertheless am compelled to vote to affirm the district court's order to seal the bill. My decision turns on the government's approach to the district court's order to provide the defendants with the names of unindicted co-conspirators referred to in the indictment. Because I find that the government exceeded the scope of the order and the bounds of its duty, I conclude that the potential damage to wrongly-named individuals constitutes a compelling governmental interest warranting the sealing of the bill of particulars.
 
 
 85
 At oral argument before this court, the government asserted that it had used a broad brush in its response to the district court's order to file a bill of particulars and that it had done so for the tactical purpose of not limiting the evidence it could produce at trial. The government argued:
 
 
 86
 It [a bill of particulars] is the statement of the government as to what it believes its evidence will show or could conceivably show and I think one important point to bring out is that it is in the interest of a prosecutor faced with a proper Bill of Particulars to answer it as broadly as possible so that the adverse legal consequence of having his proof restricted at trial will not later come about.
 
 
 87
 The government further explained that it used the "could conceivably be considered as unindicted co-conspirator" language so that it might "preserve the government's right to introduce the broadest range of evidence by trial time that it may deem to be necessary and relevant and not have any proof precluded under the rules of law that apply to a Bill of Particulars." Indeed, the district court found that the government had listed "the names of persons who, in the opinion of the United States Attorney, are unindicted co-conspirators in this case or could conceivably be considered as unindicted co-conspirators due to their alleged involvement in events included in the conspiracy." While the actual language of the sealed bill of particulars is properly circumspect,[3] the representations of the government at oral argument suggest that the defendant William Smith correctly characterizes the government's efforts as an attempt to preserve the availability of the exception to the hearsay rule contained in Federal Rule of Evidence 801(d)(2)(E).
 
 
 88
 Neither Federal Rule of Evidence 801(d)(2)(E) nor Federal Rule of Criminal Procedure 7(f) contemplates the use of a bill of particulars as a tool for alleviating the harshness of the hearsay rule. Because a bill of particulars is designed to define an indictment and because it serves as a defacto modification of a grand jury's indictment, the government must take special care to make only those representations which are supported by its evidence at that time. The interests of the public and of the defendant are not served by the production of an overbroad bill of particulars which provides the government with great latitude in the description of the crime charged. The defendant's interest in a narrowly drawn indictment and bill of particulars is founded in the constitutional guarantees of adequate notice of the charges against him and of an adequate description of the offense as a protection against a second trial for the same acts. The public is entitled to a speedy and public trial of the accused. The public's interest in a speedy trial means that the government's case should be properly defined and ready for trial in a relatively short period of time. These interests require that the government be prepared to name as unindicted co-conspirators in a bill of particulars only those individuals for whom it has the requisite evidence. The government may not speculate as to those who could conceivably be co-conspirators.
 
 
 89
 The government's position in the instant matter forces me to the conclusion that improperly named individuals might be subject to embarrassment, ridicule, scorn, or damage to reputation and career as the result of the disclosure of the bill of particulars. Under these circumstances, where the government has overstepped the bounds of the permissible use of the bill of particulars, I think the trial court had no choice but to find a compelling governmental interest and to seal the bill. The order is narrowly drawn; the names of individuals later indicted will be released. I agree therefore that the district court's order satisfies the requirements of the First Amendment.
 
 
 90
 For these reasons, I concur in the affirmance of the trial court's order sealing the bill of particulars filed by the government in this case.
 
 
 
 [1]
 Jurisdiction is based on 28 U.S.C. Sec. 1291. United States v. Criden, 675 F.2d 550, 553 (3d Cir.1982)
 
 
 [2]
 These six societal interests identified in Criden II were that public access to criminal proceedings facilitates educated debate over governmental affairs, assures that the judicial proceeding is both fairly conducted and perceived as being so, channels the societal response to crime, prevents biased or partial judicial decisionmaking, enhances the performance of the participants in the judicial proceeding, and discourages perjury. 675 F.2d at 556
 
 
 [3]
 In Criden II we also considered the procedural prerequisites to closure of criminal proceedings. Although we did not require the trial court to give individual notice to the press or public prior to entertaining a closure motion, we did require docketing of such a motion reasonably in advance of any hearing or decision on it. 675 F.2d at 559-60. Appellant does not contend that the trial court failed in this case to afford it appropriate procedural rights
 
 
 [4]
 Inclusion of the provisions of Rule 7(f) in the rule governing indictments and informations also supports this view
 
 
 [5]
 We recognize, as did the lower court, that it may become necessary to disclose some of the names in the course of the trial in order to permit the parties a fair opportunity to develop their respective cases. This does not mean, however, that the court was required to condone an unnecessary risk of serious injury to third parties
 
 
 [1]
 As the majority correctly indicates, because we find that the First Amendment protects access to bills of particulars, we need not be concerned here with the application of the common law right of access to judicial documents and proceedings
 
 
 [2]
 The majority summarizes the evolution of the indictment from lengthy documents setting forth all facets of a charge to the shorter indictments prevalent today and the concomitant emergence of the bill of particulars as a further means of clarifying ambiguity and insuring a sufficient indictment. See also 2 Wharton's Criminal Procedure Sec. 355 (12th ed. 1975)
 
 
 [3]
 The language of the bill of particulars is framed narrowly and does not include the words "could conceivably be considered an unindicted co-conspirator." A representative example of the actual language employed by the government follows: "The Government's evidence at trial will indicate that the following individuals are unindicted co-conspirators under paragraph 2 of Count I of the Indictment."