**UNITED STATES of America, Plaintiff,**

v.

**Jaime GONZALEZ, Defendant.**

**Crim. A. No. 95–52 MMS.**

United States District Court,
D. Delaware.

May 30, 1996.

---

Edmond Falgowski, Assistant United States Attorney, Department of Justice, Wilmington, Delaware, for plaintiff.

John S. Malik, Wilmington, Delaware, for defendant.

Richard G. Elliott, Jr., Helen M. Richards, Richards, Layton & Finger, Wilmington, Delaware, for intervenor The News Journal Company.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### I. Introduction

The News Journal Company (the "News Journal") has filed a motion to intervene in a criminal case for the limited purpose of seeking access to judicial records, Docket Item ("D.I.") 95 (the "Motion to Intervene"), and a motion to unseal certain documents filed under seal in *United States v. Gonzalez*, Crim. No. 95–52–MMS (the "Motion to Unseal"), D.I. 96. The Motion to Intervene was granted, D.I. 106, and the matter remaining before the Court is the Motion to Unseal. On joint motion of the government and the defendant, the Court had granted a protective order to seal these documents on March 12, 1996 (the "Protective Order"). For the reasons set forth below, the Motion to Unseal will be granted.

### II. Factual Background

On the morning of August 15, 1990, a bomb exploded at a trailer park located in New Castle County, Delaware, fatally wounding Julio Gonzalez. The bomb had been home-made, consisting of an electronically-triggered explosive device in a five-gallon kerosene can filled with a flammable liquid. Investigation and interviews with, among other persons, the victim's surviving common law wife, led state officials to consider Jaime Gonzalez (no relation), defendant herein, as the primary suspect. The defendant was indicted in the Superior Court of the State of Delaware in and for New Castle County on September 12, 1990 on several charges, including murder and arson. Trial commenced on April 23, 1991. On May 9, 1991, the jury found the defendant not guilty on all counts of the state's indictment.

On August 8, 1995, defendant was indicted in the United States District Court for the

District of Delaware on three counts consisting of the following federal charges: (1) Interstate Transportation of an Explosive, in violation of 18 U.S.C. § 844(d); (2) Carrying an Explosive during the Commission of a Federal Felony, in violation of 18 U.S.C. § 844(h); and (3) Traveling in Interstate Commerce with Intent to Promote the Delaware State Offense of Arson, in violation of 18 U.S.C. § 1952.[1] After a three week trial, on December 19, 1995, a jury found defendant guilty on Counts I and III.

Both prior to and during defendant's federal trial, the case received publicity throughout the local media. Much of this publicity was generated by the fact that defendant had been tried and acquitted of state charges which had arisen out of the same set of events. *See, e.g.,* Jerry Hager, *Man Acquitted of Arson Back in Prison,* NEWS JOURNAL, Oct. 18, 1995, at B1; Jerry Hager, *Gonzales Jury Hears About His Earlier Acquittal,* NEWS JOURNAL, Dec. 13, 1995, at B1; Jerry Hager, *Firebomb Killed Man by Accident, Gonzales' Defense Argues Again,* NEWS JOURNAL, Dec. 5, 1995, at B3. Adding further media appeal to the case was the fact that one of the government's primary witnesses against defendant in the federal trial was his own daughter, an alibi witness in the state prosecution, who had subsequently recanted her testimony. *See, e.g.,* Jerry Hager, *Girl May Testify in Dad's Firebomb Trial,* NEWS JOURNAL, Dec. 9, 1995 at A3; *Family Feud, Incest, Add to Drama of Arson Trial,* NEWS JOURNAL, Dec. 4, 1995 at A3.

Also testifying on behalf of the government, as an expert witness, was Edward R. Bender ("Bender"). Bender is a chemist in the Explosives Section of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), a position he held in August, 1990, the period during which the remnants of the explosive device used in this case were analyzed by ATF. Bender was a specialist in explosives and trace materials analysis, and had been called by the prosecution to testify regarding the design and chemical engineering of the explosive device. He stated that he analyzed the residue found within an exploded pipe found at the scene which proved to be black powder, which matched certain black powder found at the defendant's basement. Bender further opined that after comparing the gray paint found on bomb remnants with a can of gray paint found in defendant's basement, the two paints were chemically identical.

Subsequent to conviction but before sentencing, the Assistant United States Attorney who prosecuted the case came into possession of certain documents from the United States Department of Justice ("Justice Department") containing certain allegations of Frederic Whitehurst ("Whitehurst"), a Laboratory Examiner at the Federal Bureau of Investigation ("FBI"). The substance of the allegations was that certain chemists and other laboratory personnel at the FBI had engaged in, *inter alia,* evidence tampering, violations of FBI laboratory analysis protocols, and the issuance of scientific opinions without proper empirical bases. The documents consisted of 129 Bates-stamped pages containing allegations directed at Bender (the "Bender Documents"), who had previously been employed as a chemist at the FBI before he began his tenure at ATF.[2]

The factual allegations contained in the Bender Documents included, *inter alia,* allegations of (1) Bender's failure to follow FBI Materials Analysis Protocol in examining residue and trace materials found on explosive fragments, and in examining residue and trace materials found in areas where the explosive device had been detonated; (2) his keeping an inordinately sloppy and dirty work environment in his laboratory; (3) his failure to wash and sterilize laboratory glassware to be used in lab analysis work; (4) his rendering of scientific opinions without proper empirical bases for his conclusions; (5) his failure to label instrumental output from testing performed in connection with analysis of physical evidence; and (6) his incom-

---

1. On December 4, 1995, the government moved to dismiss Count II of the Indictment, and the motion was granted that same day. *See* D.I. 65.

2. The four sealed documents to which access is sought are three post-trial briefs and an appendix which have been sealed because they contain information from the Bender Documents. For convenience, the Court will hereinafter refer to all sealed post-trial submissions as the Bender Documents.

petence to testify as an expert in explosives analysis. *See* D.I. 87 (Defendant's Motion for a New Trial), ¶ 8.

The United States Attorney's Office, while taking the position that the Bender Documents did not constitute exculpatory material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), nonetheless disclosed the documents to defendant. On joint motion of the parties, this Court issued a Protective Order permitting the government to disclose the Bender Documents to defendant while preserving their confidential and privileged nature. D.I. 84. As is apparent from the face of the Protective Order, the government had also contemplated sealing the Protective Order itself. *See id.* However, after a telephone discussion with the Court, the request to include the language sealing the Protective Order was withdrawn.

On the basis of the Bender Documents, defendant moved for a new trial on March 26, 1996 (the "Motion for a New Trial"). D.I. 87. The Motion for a New Trial was not filed under seal but the supporting brief and appendix were filed under seal. D.I. 92, 93. In his Motion for a New Trial, defendant argues that the Bender Documents contain exculpatory evidence which is material to defendant's conviction, falling within the purview of *Brady,* and should have been disclosed prior to trial. D.I. 87. While defendant does not urge that the Assistant United States Attorney withheld the Bender Documents, since the prosecutor was not made aware of their existence until after the trial, defendant asserts that the prosecutor is nonetheless responsible for revealing all exculpatory evidence, even if not personally known to him. *Id.* The government, opposing defendant's Motion for a New Trial, filed its opposition brief under seal. D.I. 99. De-

fendant then filed his reply brief under seal. D.I. 108.

On May 2, 1996, the News Journal, having learned of defendant's Motion for a New Trial, moved to intervene for the limited purpose of seeking access to judicial records, namely, Docket Items 91, 92 and 93, the supporting documents to defendant's motion.[3] D.I. 95. The Motion to Intervene was granted. D.I. 106. The News Journal also filed a Motion to Unseal Docket Items 91, 92 and 93. D.I. 96. The government and defendant opposed the Motion to Unseal, *see* D.I. 100 and D.I. 102. A hearing was held on May 10, 1996 on the News Journal's Motion to Unseal. At that hearing, having been informed by the Court that since the time its motion was filed, the government had filed its sealed opposition brief to defendant's Motion for a New Trial, *see* D.I. 99, the News Journal expanded its Motion to Unseal to include Docket Item 99. On May 23, 1996, defendant filed his reply brief under seal; the News Journal's Motion to Unseal will be deemed to be also directed at this entry, Docket Item 108. Further, the News Journal moved to unseal Docket Item 56.[4] The News Journal's primary argument is that it has a First Amendment right of access to the Bender Documents. D.I. 97. The News Journal asserts that the government and defendant have not met their burden to keep these documents under seal.[5]

The government responds by arguing that neither a common law right of access nor the First Amendment right of access favors access to the Bender Documents. D.I. 100. It argues that there are compelling privacy, investigative and policy interests which outweigh the right of access. First, the government argues that disclosure of the Bender Documents would cause persons and entities named within them to have their privacy and reputation interests invaded, possibly unnec-

---

**3.** Contrary to the News Journal's Motion to Unseal, Docket Item 91 was not filed under seal. Docket Item 91 is defendant's Motion to Seal Defendant's Opening Memorandum and Appendix in Support of Defendant's Motion for New Trial. Because this document was not filed under seal, the Court will not further address the News Journal's Motion to Unseal as to this Docket Item.

**4.** Docket Item 56 was filed on November 27, 1995, a date long before defendant filed his Motion for a New Trial. Docket Item 56 has no relevance to the Bender Documents, and will be ordered unsealed.

**5.** The News Journal did not advance a common law right of access argument.

essarily. *Id.* at 5. Second, the government urges that the Bender Documents are investigative material concerning an ongoing Justice Department investigation which should not be impaired by media attention. *Id.* Third, the government maintains that if the Court were to unseal the Bender Documents, future disclosures of a similar nature would be chilled. *Id.* Defendant joins this latter argument. D.I. 102. Further, the government argues that the Court can narrow the Protective Order so that to the extent that the substance of portions of the documents is already in the public domain, these portions can be unsealed, while certain other portions may still be protected, and the Court can later revisit the order if the protected portions are later deemed admissible evidence in a new trial. *Id.*

### III. Analysis

In *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), the Supreme Court recognized that in the context of criminal proceedings, the press has an historically-based, common law right to copy and inspect judicial records and documents. The decision has spawned a series of cases which has incrementally expanded the scope of both judicial records as well as judicial proceedings amenable to access by the public, primarily through its surrogate, the press. Included within the scope of access are audiotapes of conversations of President Nixon, *id.*; criminal trials, *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (trials involving specified sexual offenses where victim is under age of eighteen); voir dire examination of potential jurors, *Press–Enter. Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press–Enter. I*); and preliminary hearings, *Press–Enter. Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enter. II*).

The Third Circuit Court of Appeals has applied right of access principles to find a right of access to copies of video and audio tapes admitted into evidence and played to the jury during a criminal trial, for the purpose of later rebroadcasting the same to the public, *United States v. Criden,* 648 F.2d 814 (3d Cir.1981) (*Criden I*); suppression, entrapment and due process hearings, *United States v. Criden,* 675 F.2d 550 (3d Cir.1982) (*Criden II*); transcripts of certain tapes admitted into evidence, when the transcripts were not themselves admitted into evidence, *United States v. Martin,* 746 F.2d 964 (3d Cir.1984); bills of particulars, *United States v. Smith,* 776 F.2d 1104 (3d Cir.1985) (*Smith I*); transcripts of sidebar and in-chambers conferences at which evidentiary or other substantive rulings have been made, *United States v. Smith,* 787 F.2d 111 (3d Cir.1986) (*Smith II*); post-trial hearings to investigate juror misconduct, *United States v. Simone,* 14 F.3d 833 (3d Cir.1994); and transcripts of voir dire proceedings from which the press excluded itself at the request of the presiding judge, *United States v. Antar,* 38 F.3d 1348 (3d Cir.1994).

These cases have been decided on two closely related theories: the so-called "common law right of access" and the "First Amendment right of access." Despite the similar nature of these theories, there are important distinctions between them. One such distinction is the scope of review employed by the appellate court. With respect to common law right of access, the appellate court reviews the district court's order for abuse of discretion. *Smith II,* 787 F.2d at 113; *In re Capital Cities/ABC, Inc.'s Application for Access to Sealed Transcripts,* 913 F.2d 89, 92 (3d Cir.1990). In the First Amendment context, however, the appellate court undertakes a much broader review, including independent consideration of the district court's order and the factual findings inferred from the evidence before it. *Capital Cities,* 913 F.2d at 92 (quoting *New York Times v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964)); *see also Antar,* 38 F.3d at 1357. Another significant difference between the doctrines is the different standards employed by the district court. Common law right of access cases are resolved under a balancing test framework. *See generally Criden I,* 648 F.2d 814. First Amendment right of access cases, however, are analyzed under a constitutional compelling interest/narrowly tailored framework.

*Globe Newspaper,* 457 U.S. at 606–07, 102 S.Ct. at 2619–20; *Press–Enter. I,* 464 U.S. at 509–10, 104 S.Ct. at 823–24.

Although these largely parallel lines of cases are analyzed under different principles, the rationales for both doctrines are becoming increasingly difficult to differentiate, possibly because every order sealing documents has, by definition, a court-closure component. *Compare, Smith II,* 787 F.2d at 113–15 (finding a common law right of access based on First Amendment right of access rationale); *with Antar,* 38 F.3d at 1360–61 (finding a First Amendment right of access based, in part, on common law principles). Recently, the Third Circuit Court of Appeals has examined whether the party seeking access has a valid claim to access under both doctrines at the same time, without any indication that one doctrine or the other would be the more appropriate vehicle to access the desired information. In *Capital Cities,* 913 F.2d 89, the Third Circuit appellate court applied the reasoning of *Smith I,* a First Amendment case, and *Smith II,* a common law access case, to ultimately remand the matter to permit the press to pursue common law or First Amendment right of access to the sealed documents in question. *Id.* at 94–95.

A further consideration remains in the background which affects how issues involving related constitutional and common law theories should be resolved. It is a fundamental jurisprudential principle that a court should avoid resolving constitutional questions wherever determination on nonconstitutional grounds is possible. *Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). This principle would suggest that access to sealed documents should be determined, if possible, on common law rather than constitutional principles. However, because the Third Circuit appellate court has recognized that both theories provide a right of access to judicial records, the Court will examine the case *sub judice* under both the common law and the First Amendment right of access theories.

Further, reaching the constitutional right of access in addition to the common law right of access serves another important purpose. At the hearing on the News Journal's Motion to Unseal, the Court inquired of the government how the oral argument relating to the defendant's Motion for a New Trial would be conducted if the substance of the Bender Documents presently under seal remains under seal. Specifically, the Court asked whether the government would request that the press be excluded from the proceedings. The government stated that its argument would be conducted "in general terms," without *specific* reference to the Bender Documents. Transcript of Proceedings, at 43.

There are several difficulties with the government's position. First, this suggestion of conducting argument in "general terms" is not binding upon and is unfair to defendant. Second, defendant's Motion for a New Trial is predicated solely on the Bender Documents. If the parties do not point to specific items within them, argument would be singularly unhelpful. This raises the specter that the Court itself would become an unwitting victim of the grant of a stipulated motion to seal documents. Given that unacceptable eventuality, it follows that the only realistic options for the Court would be to either dispense with oral argument altogether, a solution surely unacceptable and unfair to defendant, or to hold the argument but exclude the press. This latter option cannot be entertained. It is beyond peradventure that the press would renew its request to this information in the form of a First Amendment right of access claim to the argument on defendant's motion for new trial. It follows the constitutional issue of court closure will arise on or before June 25, 1996, the date established for the argument on defendant's motion for new trial. Given these practical considerations, as well as the state of the law as developed by the Third Circuit Court of Appeals, the Court will adjudicate the merits of the First Amendment claim after addressing the common law right of access.

## A. *Common Law Right of Access*

The common law right of access to judicial records was first expressly recognized by the Supreme Court in *Warner Communications,* 435 U.S. 589, 98 S.Ct. 1306. There, the press sought access to tapes containing conversations of President Nixon. The Court began

its analysis with the proposition that "[i]t is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Id.* at 597, 98 S.Ct. at 1312. This right of access stems from the "citizen's desire to keep a watchful eye on the workings of public agencies" and the "newspaper publisher's intention to publish information concerning the operation of government." *Id.* at 597–98, 98 S.Ct. at 1311–12. This right of access, however, is not without limits. "It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Id.* at 598, 98 S.Ct. at 1312 (citations omitted). The precise delineation of the contours of the common law right was a task the Court declined to undertake, and thus the decision as to access was left to the discretion of the trial court, "a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.* at 599, 98 S.Ct. at 1312 (footnote omitted).

The Third Circuit Court of Appeals has applied this analysis to find a common law right of access to audio and video tapes admitted into evidence in *Criden I,* 648 F.2d 814. There, television networks appealed the order of the district court denying the networks' application for permission to copy certain video and audio tapes, introduced at trial and admitted into evidence, for the purposes of later rebroadcasting the same to the public. The circuit court reversed the order, finding that the right to inspect and copy antedates the Constitution, *id.* at 819, and that the right is justified on the public's right to know, encompassing public documents generally, and the public's right to open courts, particularly applying to judicial records. *Id.* This right of access was predicated on the common law right of access to judicial records and the public interest in "observation, participation, and comment." *Id.* at 823.

The *Criden I* court concluded that there is a "strong presumption that material introduced into evidence at trial should be made reasonably accessible" to the public. *Id.* at 823. The court, however, noted that common law right of access was not absolute: the district court maintains the discretion to deny copying for rebroadcast of evidence which "may inflict unnecessary and intensified pain on third parties who the court reasonably finds are entitled to such protection." *Id.* at 829. This qualification recognizes the district court's power to "balance the strong public interest favoring access against legitimate privacy concerns of third parties," *id.,* which if, on balance, the privacy interests outweigh the public right, certain portions may be excised. *Id.; see also United States v. Criden,* 681 F.2d 919, 921 (3d Cir.1982) (*Criden III* ) (blanket excision of all references to third parties, firms or corporations not named as defendants in any related prosecutions constitutes reversible error; only those references "rising to the level of intensified pain, as distinguished from mere embarrassment" warrant excision).

In *Martin,* 746 F.2d 964, the Third Circuit Court of Appeals held that the strong presumption in favor of a common law right of access extends to transcripts of certain audiotapes which had been admitted into evidence during a criminal trial, although the transcripts themselves were not admitted into evidence. Noting that both justifications for the presumption of access, *i.e.* the common law right of access to judicial records and the public interest in observation, participation and comment, supported a strong presumption in favor of access to the transcripts at issue, the court stated:

> We find that both of these factors support a strong presumption in favor of access to these transcripts. The common law right of access is not limited to evidence, but rather *encompasses all "judicial records and documents."* It includes "transcripts, evidence, pleadings, and *other materials submitted by litigants."*

*Id.* at 968 (citations omitted) (emphasis supplied).

The common law right of access was further extended to encompass certain transcripts of sidebar or in-chambers conferences during criminal trials. *Smith II,* 787 F.2d 111. In *Smith II,* the Third Circuit Court of

Appeals applied the rationale of the First Amendment right of access cases, *see infra*, to require vindication of the public interest at sidebar or in-chambers discussions, during presumptively open criminal trials, at which evidentiary or other substantive rulings are made. It was the rationale of the First Amendment right of access cases, rather than the common law right of access cases, which prompted the result, although the court ultimately found the common law right of access to prevail.

A sidebar conference at which a question to a witness was proffered and an objection sustained is an integral part of a criminal trial. Thus, if there has been no contemporaneous observation, the public interest in observation and comment must be effectuated in the next best possible manner. This is through the common law right of access to judicial records. By inspection of such transcripts, the public, usually through the press, can monitor, observe, and comment upon the activities of the judge and of the judicial process. We hold, therefore, that the common law right of access to judicial records enunciated in *Criden I* is fully applicable to transcripts of sidebar or chambers conferences in criminal cases at which evidentiary or other substantive rulings have been made. *Id.* at 114–15.[6] Thus, it was the fact that the sidebar and in-chambers conference were "integral" parts of the criminal proceedings, proceedings for which the Supreme Court has found a First Amendment right of access, rather than the documentary nature of the transcripts, which compelled this conclusion.

■ Having reviewed Third Circuit appellate decisions concerning the common law right of access, the Court now turns to the applicable legal standard. To determine whether there are interests sufficient to outweigh the strong presumption of access to judicial documents, the burden is on the party seeking to keep the documents sealed to demonstrate that the factors opposing access outweigh those favoring it. *Smith II*, 787 F.2d at 115 (citing *Criden I*). The Third Circuit appellate court has noted that under certain circumstances, privacy or reputation interests may outweigh the public's common law right of access. *See Criden I*, 648 F.2d at 829; *Smith I*, 776 F.2d at 1110, 1113 (danger that disclosing names of unindicted co-conspirators would cause serious injury to innocent third parties outweighs right of access); *Capital Cities*, 913 F.2d at 94 (matter remanded for district court to determine whether reputation or privacy interests of third parties outweigh common law or First Amendment rights of access).

In the case *sub judice*, the government advances three arguments in favor of keeping the Bender Documents under seal which, taken together, outweigh the public's interest in disclosure.[7] First, the government argues that privacy interests of third parties mentioned in the Bender Documents, including the privacy interest of the FBI as an entity,

---

**6.** The Court notes the appellate court's rationale in part because in *Smith I*, the court suggested that the First Amendment right of access applies to *proceedings*, while the common law right of access applies to *documents*. "Thus, whether appellant's right of access is grounded on the First Amendment right of access to judicial proceedings or on the common law right of access to judicial documents, privacy rights may outweigh the public's interest in disclosure." *Smith I*, 776 F.2d at 1113. This language would suggest that when the information sought is documentary in nature, rather than in the form of live proceedings, the issue should be resolved under common law principles. Cases since *Smith I*, however, have not consistently upheld the dichotomy between documents and proceedings, as noted *supra*, and it is not clear that the Third Circuit Court of Appeals continues to analyze them separately.

**7.** These arguments were advanced in connection with the News Journal's First Amendment right of access argument. The burden to overcome the presumption of access may or may not be greater under a common law right as opposed to a First Amendment right, as the Third Circuit appellate court has expressly declined to opine as to which standard is more difficult to meet. *See Smith I*, 776 F.2d at 1112 ("Since access to bills of particulars is protected by the First Amendment, as well as the common law right of access to the judicial process, we need not reach the issue of whether the standard for overcoming the common law 'strong presumption' of access is the same as the standard for overriding First Amendment protection."). Because the Court is addressing both the common law and the First Amendment rights of access, the government's arguments will be addressed at this point in the discussion.

strongly support keeping them under seal. Second, the fact that the Bender Documents contain investigative material forming part of an ongoing investigation weighs against unsealing. Third, the government argues that policy reasons dictate that the Bender Documents remain under seal. The Court will address each argument separately.

### 1. *Privacy Interests*

The government argues that privacy interests of third parties, and of the FBI as an agency, are alone sufficient to outweigh the presumption of access. To be sure, the Third Circuit Court of Appeals has recognized that privacy interests may, in certain circumstances, outweigh the common law right of access to judicial documents. *See Criden I,* 648 F.2d at 829; *Smith I,* 776 F.2d at 1110, 1113. However, it has required a showing that disclosure would inflict "unnecessary and intensified pain on third parties who the court reasonably finds are entitled to such protection" in order to rise to the level required to outweigh the strong presumption of access. *Criden I,* 648 F.2d at 829; *Criden III,* 681 F.2d at 921. Unflattering or false references or mere embarrassment are not sufficient to rise to this level. *Criden III,* 681 F.2d at 922. Further, one's privacy interests are diminished where the matter at issue has already been made public. *See Smith II,* 787 F.2d at 116 ("As a high official in the state's Republican Party, he is a public person and subject to public scrutiny. Moreover, his possible connection with the matter at issue in the trial has already been made public since he testified as a witness. Thus his privacy interests are substantially diminished.").

In this case, the substance of the allegations against Bender has been made public by the filing of defendant's Motion for a New Trial. The News Journal was able to articulate the general nature of the allegations against Bender, including his alleged disregard for FBI protocols, his sloppiness, his dirty work environment and his use of contaminated utensils, based on the *unsealed* Motion for a New Trial filed by defendant. *See* D.I. 87. Similarly, the allegations against the FBI generally have already been widely reported in the national press. The only information the News Journal does not have is the specifics of the allegations and the names of the people attesting to the same. Thus, Bender's privacy interests have already been diminished, and disclosure of the Bender Documents would not inflict "unnecessary and intensified pain on third parties who the court reasonably finds are entitled to such protection." *See Criden I,* 648 F.2d at 829.

The government argues that disclosure of the specific allegations made against Bender is akin to disclosure of the names of unindicted but possible co-conspirators in a criminal trial, such as in *Smith I,* 776 F.2d 1104. There, the Third Circuit Court of Appeals held that the names of certain persons named in a bill of particulars who may have been involved in bribery scandal of public officials should remain under seal because of the grave risk of serious injury to these individuals who, at that point, had not yet been indicted.

If published, the sealed list will communicate to the general public that the named individuals, in the opinion of the chief federal law enforcement official of the District, are guilty, or may be guilty, of a felony involving breaches of the public trust. This broad brush assertion will be unaccompanied by any facts providing a context for evaluating the basis for the United States Attorney's opinion with respect to any given individual. When one adds to this that the United States Attorney's opinion was formed on the basis of an investigation that had not yet reached the point where he was willing to make a decision on whether to prosecute, it becomes apparent that the risk of serious injury to innocent third parties is a grave one. Finally, as the trial judge noted, the named individuals have not been indicted and, accordingly, will not have an opportunity to prove their innocence in a trial. This means that the clearly predictable injuries to the reputations of the named individuals is likely to be irreparable.

The individuals on the sealed list are faced with more than mere embarrassment. It is no exaggeration to suggest that publication of the list might be career ending for

some. Clearly, it will inflict serious injury on the reputations of all.

*Id.* at 1113–14. The government argues that like the unindicted possible co-conspirators in *Smith I,* the persons named in the Bender Documents are merely persons against whom certain other individuals have lodged complaints and/or made unfavorable allegations. The government further urges that these complaints and allegations are, as yet, unsubstantiated, still subject to an ongoing investigation, and their veracity remains untested. Publication of the Bender Documents, the government asserts, will needlessly impugn the reputations of Bender and others named in the documents prior to any affirmative determination as to their veracity.

■ While there may be some appeal to the notion that the reputations of persons against whom allegations have been made should be preserved until such time as the allegations can be corroborated or verified, the Court finds that the subject allegations in no way rise to the level of publication of the names of certain individuals the United States Attorney suspects of committing a felony but has not yet indicted. First of all, there is a significant distinction between naming certain persons as possible felons and alleging that certain persons have poor work habits or lack scientific ability. The latter scenario is akin to unflattering references or mere embarrassment which the Third Circuit appellate court has expressly found to be insufficient to warrant protection. *See Criden III,* 681 F.2d at 922.

Additionally, the substance of Whitehurst's allegations against individuals employed at the FBI, and against the FBI generally, has been widely publicized. Certain individuals have already been named in connection with their work on well known criminal investigations, including the bombing of the World Trade Center, the O.J. Simpson trial, and the bombing of the Oklahoma City Federal Building. As to the FBI generally, the Whitehurst allegations concerning the FBI have been a subject of national discussion, achieving particular notoriety during the recent criminal prosecution of O.J. Simpson. *See, e.g.,* Jeff Stein, *Bomb for the FBI: Agent's Charges in Simpson Case Hint Years of Fakery,* BALTIMORE SUN, Dec. 17, 1995, at 1E; Ronald Kuby, *Manipulation of FBI Evidence Threatens Us All,* NEWSDAY, Nov. 16, 1995, at A44; Marcy Gordon, *FBI Crime Lab Faces Scrutiny from Experts,* PORTLAND OREGONIAN, Nov. 9, 1995, at A8; *Whistle–Blowers Raise Doubts About FBI Lab's Accuracy, Honesty,* SUN SENTINEL, Sept. 24, 1995, at 4H. Thus, to the extent that the FBI's privacy and reputation interests remain intact, they have been substantially diminished by the widespread media coverage of Whitehurst's general allegations.

In sum, the allegations against the FBI are already in the public domain. The allegations directed against Bender personally have been made public by the filing of defendant's unsealed Motion for a New Trial. The argument that disclosure of the Bender Documents will cause the level of damage to the privacy or reputations of third parties required by the Third Circuit appellate court before protection is warranted, is simply not convincing.

### 2. Investigation Interest

The government's second argument is that the Bender Documents constitute investigative material which is part of an ongoing investigation by the federal government. The government argues that if the public and the press become involved in their own independent evaluations of what occurred at the FBI, this may impede or interrupt the federal investigation. The government also argues that unsealing the Bender Documents will have a chilling effect on truthful disclosure of potential interviewees, which might also obstruct the investigation. By analogy to a case which denied the press's request to unseal search warrant affidavits, the government argues that the press has no right to this evidence which is the subject of a continuing investigation. *Cf. Baltimore Sun Co. v. Goetz,* 886 F.2d 60 (4th Cir.1989) (no First Amendment right of access to search warrant affidavits).

■ The government has not provided any binding authority for the proposition that the common law right of access should yield to an interest in unencumbered investigations. *Baltimore Sun,* 886 F.2d 60, while discussing

the concern that disclosure of the search warrant affidavit might have an adverse effect on the investigation, was decided on other grounds.[8] Its discussion about the success of the investigation was merely dictum. At any rate, other appellate courts have decided this issue differently, *see, e.g.,* *In re Search Warrant for Secretarial Area Outside Office of Gunn,* 855 F.2d 569 (8th Cir.1988) (finding First Amendment right of access to search warrant affidavits); *In re Application of Newsday, Inc.,* 895 F.2d 74 (2d Cir.) (finding common law right of access to search warrant application), *cert. denied sub nom., Gardner v. Newsday, Inc.,* 496 U.S. 931, 110 S.Ct. 2631, 110 L.Ed.2d 651 (1990). The Third Circuit Court of Appeals has yet to address the issue.

Even assuming *arguendo* the Third Circuit appellate court would consider the *Baltimore Sun* dictum to be a relevant consideration, it is difficult to accept the argument that persons selected to be interviewed, and possibly put under oath, would withhold information out of fear that their statements would enter the public domain. Further, the status of the investigation belies this argument. The investigation is clearly not in its nascent stage, where the risk of disclosing information might affect its viability. At the hearing on the News Journal's Motion to Unseal, the government informed the Court that the investigation of the FBI lab has been underway for a period of years. Transcript of Proceedings, at 24–26. According to the government, the Inspector General's Office had knowledge of Whitehurst's allegations for approximately a year and a half before the information was given to the Justice Department, in mid–1995. The Justice Department then began its own review of the materials and investigation of the allegations. The government also stated that the Inspector General's Office is expected to reduce its findings to a report to be issued this summer. Although the government makes the bald assertion of a chilling effect on truthful disclosure, not only is there no empirical evidence supporting this proposition, but in all probability, most, if not all, interviews have already been completed. Accordingly, the Court concludes that this argument is seriously lacking.

### 3. Policy Interests

Finally, the government advances a policy argument in favor of leaving the Bender Documents sealed. The government argues that while it takes the position that the materials are not *Brady* material, the government turned the Bender Documents over to the defendant in order to allow defendant to make his own independent evaluation. The government argues that since the United States Attorney's Office is charged with the responsibility to make the determination of the materiality to guilt or punishment under *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197, if the Court were to unseal these documents, in the future, the government will be more circumspect as to what materials are made available to the defense.[9] "If the District Court were to unseal the protected documents, future disclosures of a similar nature would be chilled." D.I. 100 at 5.

At the hearing, the Court asked whether the government would have produced the Bender Documents even if the Court had not granted the Protective Order; the government answered in the affirmative:

> With a gentleman's understanding. I would have asked [defense counsel] for a gentleman's agreement and to honor my request to essentially adhere to the conditions of a protective order. I'm confident he would have agreed and we would have gone no further.

**8.** In *Baltimore Sun,* The Fourth Circuit Court of Appeals held that the First Amendment right of access did not extend to search warrant affidavits, not because of the investigation, but because the proceedings for the issuance of search warrants are not open, but rather, are "necessarily" *ex parte. Id.* at 64. "The Sun's claim of a first amendment right of access to the warrant fails because it does not satisfy the first prong of the [*Press–Enterprise II*] test." *Id.; see infra* Part B

(discussing *Press–Enterprise II* two-part test). This case does not stand for the proposition asserted by the government that the interest in an investigation outweighs the press's right of access to the documents.

**9.** The government concedes that there exists a *Brady* issue, but that the possibility of it being deemed *Brady* material is *de minimis.*

Transcript of Proceedings, at 36. When asked what would motivate the government to turn over documents it does not believe to be *Brady* material, the government admitted that such a decision would be motivated, at least in part, by a desire to prevent an accusation that the United States Attorney's Office, or the Assistant United States Attorney in particular, was withholding *Brady* material. *Id.* at 36–37.[10]

■ The Court is not persuaded by the government's policy arguments. By its own admission, the government will continue, in the future, to divulge questionable *Brady* material to the defendant to allow the defendant to independently evaluate the material. Whether or not it will do so under a Protective Order or a "gentleman's agreement" is not the Court's concern: inasmuch as the Supreme Court has charged the government with certain duties under *Brady*, the Court has no reason to suspect that the United States Attorney's office will not continue to conscientiously adhere to this duty. Further, to accept this argument runs perilously close to endorsing the proposition that the government could be "chilled" from performing its constitutional duty under *Brady*. Hopefully, that will never happen.

The government makes much of the fact that it is far from clear that the Bender Documents would ever be admissible at a later trial, if the defendant's Motion for a New Trial were granted. The Court recognizes that the Third Circuit appellate court has left open the possibility that if the information sought would be deemed inadmissible either because it is unreliable or too prejudicial, the dangers of granting access may outweigh the benefits. "Where proffered evidence is found inadmissible because it is unreliable, or because it is more prejudicial than probative, the dangers of broad dissemination may substantially outweigh any benefits." *Martin*, 746 F.2d at 969. The govern-

ment has urged that a substantial portion of the information sought in this case may be inadmissible at trial. However, this Motion to Unseal brought by the press is not an appropriate procedural setting to adjudicate evidentiary disputes which conceivably might be pivotal in ruling on the merits of defendant's Motion for a New Trial.

In sum, the Court concludes that none of the interests advanced by the government, either individually or in the aggregate, is sufficient to outweigh the strong presumption of access recognized at common law. Therefore, the News Journal's Motion to Unseal, based on the common law right of access to judicial documents, will be granted. Ordinarily, this Opinion should stop here. However, for the reasons noted above,[11] the Court will also address the merits of the First Amendment right of access.

## B. *First Amendment Right of Access*

The News Journal's main argument is that it is entitled to access to the Bender Documents under the First Amendment right of access doctrine. The First Amendment right of access to criminal proceedings has been firmly established. In *Richmond Newspapers*, 448 U.S. 555, 100 S.Ct. 2814, the Supreme Court recognized that the First Amendment guarantees the public's and press's right of access to criminal trials. The Court found that criminal trials are covered by a "presumption of openness," and as such, proceedings may only be closed if justified by an "overriding interest articulated in findings." *Id.* at 573, 581, 100 S.Ct. at 2825–26, 2829–30; *see also Press–Enter. I*, 464 U.S. at 505, 104 S.Ct. at 821–22 (extending the First Amendment right of access to voir dire proceedings).

■ The Supreme Court has created a two part-inquiry designed to determine whether a particular proceeding is one to which the First Amendment right of access attaches.

---

**10.** To its credit, the Delaware United States Attorney's Office has a prosecutor controlled "open file" policy with respect to most criminal prosecutions. From the Court's perspective, this policy has avoided needless motion practice and has instilled a high level of confidence in and respect for the United States Attorney's Office on the part of the defense bar, while not compromising

its high conviction rate. The prosecutor's commendable approach to meeting the government's *Brady* obligations, while serving the purposes of his office and himself, can be viewed as an extension of the "open file" policy.

**11.** *See* Text, *supra* at 773–774.

*Press–Enter. II,* 478 U.S. 1, 106 S.Ct. 2735. First, a court must consider "whether the place and process have historically been open to the press and general public." *Id.* at 8, 106 S.Ct. at 2740. Second, a court must address "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* These two considerations are known as considerations of "experience and logic," *id.* at 9, 106 S.Ct. at 2740–41, and are rooted in the related concepts of the historic openness of criminal proceedings and the twin aims of enhancement of the basic fairness and of public confidence in the system. *Id.* In *Press–Enterprise II,* the Supreme Court concluded that the First Amendment right of access extended to the transcripts of a 41 day preliminary hearing in a criminal case, because a preliminary hearing, like a criminal trial, has historically been open to the public, and because public access serves a significant role in the process, including monitoring the prosecution and vindicating therapeutic values of the community. *Id.* at 12–13, 106 S.Ct. at 2742–43.

■ The Supreme Court has recognized, however, that in some instances, the assurance of fairness to the public and the accused outweighs the First Amendment right of access. *See Press–Enter. I,* 464 U.S. 501, 104 S.Ct. 819. If a particular proceeding passes the logic and experience test, a *qualified*

First Amendment right of public access attaches. *Press–Enter. II,* 478 U.S. at 9, 106 S.Ct. at 2740–41. This qualified right can be overcome, and closure ordered, upon satisfaction of the following standard: "Where ... the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper,* 457 U.S. at 606–07, 102 S.Ct. at 2619–20; *Press–Enter. I,* 464 U.S. at 510, 104 S.Ct. at 824.

A First Amendment right of access has been recognized by the Third Circuit Court of Appeals in connection with several stages of criminal proceedings. *Criden II,* 675 F.2d at 554, found a First Amendment right of access to pretrial suppression hearings, entrapment hearings and due process hearings. *Smith I,* 776 F.2d at 1112, extended the First Amendment right of access to a bill of particulars supporting an indictment. *Simone,* 14 F.3d 833, extended the First Amendment right of access to post-trial hearings to examine jurors for juror misconduct. Finally, *Antar,* 38 F.3d at 1359, found a First Amendment right of access to voir dire proceedings, which encompasses equally the live examinations and the transcripts which document those proceedings.[12]

12. In *Antar,* the press sought access to the transcripts of voir dire proceedings. To emphasize the court's reliance on the *Richmond Newspapers* line of cases, the court stated "It is access to the content of the *proceeding*—whether in person, or via some form of documentation—that matters." *Id.* at 1359–60. Notwithstanding its reliance on *Richmond Newspapers,* the Third Circuit appellate court also noted that the presumptive common law right of access to public judicial documents further compelled that conclusion, stating that "this long-established common law right has played a crucial role in the development of First Amendment jurisprudence." *Id.* at 1361. The court concluded that the common law right of access provides independent support for the conclusion that the First Amendment right of access extends equally to transcripts as to live proceedings. *Id.*

The News Journal had also argued that the Court's Protective Order must be vacated because it failed to hold a hearing before sealing the records. "Before a court can issue an order depriving the public of its First Amendment rights, that court must give notice of the pro-

posed order and allow interested parties to be heard so that they may challenge the order." D.I. 97 at 3. The News Journal's position is that no judicial record in a criminal case may be sealed without notice, a hearing, and particularized findings. To support its position the News Journal pointed to language in *Antar,* where the court stated:

Thus, the requirement that particularized findings of a compelling interest must be placed on the record before a hearing is closed *or a record sealed* is not only for the benefit of the reviewing court on appeal. It exists, most fundamentally, to assure careful analysis by the district court before any limitation is imposed, because reversal on review cannot fully vindicate First Amendment rights.

*Antar,* 38 F.3d at 1363 (emphasis supplied). This statement must be given context in order to appreciate its meaning. First and foremost, the appellate court was reviewing a district court order which sealed documents without first making factual findings *in reaction to* a request by the press for access. Second, in *Antar,* as noted

In this case, the Court is called to determine whether there is a First Amendment right of access to post-trial submissions. The Court must decide whether, under the reasoning of *Richmond Newspapers* and its progeny, the two-part inquiry of experience and logic supports such a constitutional right. The fact that the documents sought constitute post-trial submissions is not an issue which need detain the Court: in *Simone*, 14 F.3d 833, the Third Circuit Court of Appeals found a First Amendment right of access to post-trial hearings. Thus, the precedent for allowing access to events occurring after the trial has ended has already been established. The Court now turns to the two-part inquiry.

### 1. *Experience*

The first inquiry under the *Press–Enterprise II* test is whether there is a tradition of accessibility to the documents at issue. As stated previously, the right of access to court documents has been described as a right antedating the Constitution, *see Criden I*, 648 F.2d at 819, and the Supreme Court has observed that "courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents," *Warner Communications*, 435 U.S. at 597, 98 S.Ct. at 1312. Cited by the Court to support its observation of this historical right are cases which date back to as early as 1894. *See, e.g., Ex parte Drawbaugh*, 2 App.D.C. 404 (1894); *Sloan Filter Co. v. El Paso Reduction Co.*, 117 F. 504 (C.C.Colo.1902); *State ex rel. Nevada Title Guar. & Trust Co. v. Grimes*, 29 Nev. 50, 82–86, 84 P. 1061 (1906); *In re Egan*, 205 N.Y. 147, 154–55, 98 N.E. 467 (1912); *Ex parte Uppercu*, 239 U.S. 435, 36 S.Ct. 140, 60 L.Ed. 368 (1915); *Nowack v. Auditor Gen.*, 243 Mich. 200, 203–05, 219 N.W. 749 (1928); *Fayette County v. Martin*, 279 Ky. 387, 395–96, 130 S.W.2d 838 (1939); *McCoy v. Providence Journal Co.*, 190 F.2d 760, 765–66 (1st Cir.), *cert. denied*, 342 U.S. 894, 72 S.Ct. 200, 96 L.Ed. 669 (1951); *Unit-*

ed States v. Burka, 289 A.2d 376 (D.C.App. 1972).

While there is adequate historical precedent for access to court documents and records, precedent relating specifically to post-trial documents is sparse. Nonetheless, no principled basis suggests itself as to why the policy of historical openness of court proceedings should not also apply to post-trial submissions. *Accord, CBS, Inc. v. United States Dist. Court,* 765 F.2d 823, 825 (9th Cir.1985). Thus, unlike other courts which have been able to trace an historical practice to the time of the Norman Conquest, *see Richmond Newspapers,* 448 U.S. at 565, 100 S.Ct. at 2821; and to the trial of Aaron Burr, *see Press–Enter. II,* 478 U.S. at 10, 106 S.Ct. at 2741 no "rich historical tradition" exists to support the constitutional right of access to post-trial submissions. *See Simone,* 14 F.3d at 838 (no rich historical tradition supports constitutional right to transcripts of post-trial examination of juror misconduct). Inasmuch as the "experience" prong of the test uncovers scarce precedent, the Court concludes that an historical analysis provides minimal guidance to the determination of whether the First Amendment right of access applies to post-trial submissions. Thus, like the *Simone* court, this Court, in making its determination, will also "rely primarily on the 'logic' prong of the test." *Simone,* 14 F.3d at 838.

### 2. *Logic*

■ The second inquiry in the *Press–Enterprise II* test is whether public access to the documents plays a particularly significant positive role in the actual functioning of the process. The *Criden II* court noted six societal interests identified in *Richmond Newspapers* which were advanced by open proceedings and are relevant considerations under the "logic" prong of the inquiry. These factors are:

> (1) promotion of · informed discussion of governmental affairs by providing the pub-

---

above, the press had been ordered, albeit styled in the form of a request, to leave the courtroom during voir dire. Since live access was denied, the court found that the transcripts which documented those proceedings served as a surrogate for the actual proceeding, and its analysis proceeded under the *Richmond Newspapers* closure

line of cases, notwithstanding the fact that the information sought appeared in the form of a document. No fair reading of *Antar* supports the News Journal's capacious position that the trial judge must make particularized findings before any stipulated protective order in a criminal case may be entered.

lic with the more complete understanding of the judicial system;

(2) promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings;

(3) providing a significant community therapeutic value as an outlet for community concern, hostility, and emotion;

(4) serving as a check on corrupt practices by exposing the judicial process to public scrutiny;

(5) enhancement of the performance of all involved; and

(6) discouragement of perjury.

*Criden II*, 675 F.2d at 556; *see also Smith II*, 787 F.2d at 114; *Simone*, 14 F.3d at 839. The Court will address these interests to decide whether the "logic" prong supports a First Amendment right of access to the Bender Documents.

 With respect to the first societal interest, the Court finds that public access to these post-trial submissions would promote informed discussion of governmental affairs by providing the public with a more complete understanding of the judicial system. The subject matter of the Bender Documents goes far beyond whether Bender's testimony was properly admitted as expert testimony or whether the allegations regarding his work habits are true. These allegations go to the heart of the integrity of a powerful government investigative agency. It is beyond dispute that the "cat is out of the bag" with respect to Whitehurst's allegations against the FBI: public access to these documents will facilitate an informed discussion of these allegations.

Second, public access to the Bender Documents promotes the public "perception of fairness" to all concerned. *Criden II*, 675 F.2d at 556. Public confidence in and respect for the judicial system can be achieved only by permitting full public view of these

documents. This societal interest is the flipside of the first: public access to these documents will assure the public that as to *this defendant*, justice was or was not done. Related to this concern is the third interest: public access to the documents has a "significant therapeutic value" because it provides an "outlet for community concern, hostility, and emotion." *Id.* The public has a right to know the basis for a new trial in a highly publicized trial, if a new trial is granted. Similarly, the public has the right to know why a new trial was not granted in light of the general allegations about Bender. Illumination under the public microscope, while it reveals imperfections, also instills public confidence in judicial resolution of criminal cases. In contrast, secrecy serves no purpose other than creating skepticism or pessimism about the judicial process. Further, public access will also serve as a check on the judicial process, thus discouraging decisions based on secret bias or partiality, which has been identified as the fourth societal interest.

Finally, public access serves the fifth and sixth societal interests by enhancing the performance of all involved and discouraging perjury. Once the Bender Documents are in the public domain, the testimony of witnesses, particularly Bender, will be capable of meaningful evaluation. The veracity of any future testimony will be capable of being tested, or at least evaluated with a greater degree of information.

 In conclusion, the Court finds that the "logic" prong of the *Press–Enterprise II* test supports a First Amendment right of access to the Bender Documents. Since this right of access is qualified, the next step in the analysis is to determine whether there are compelling interests which overcome the First Amendment right of access, and whether an order to seal the documents can be narrowly tailored to serve those interests. *See Press–Enter. II*, 478 U.S. at 13–14, 106 S.Ct. at 2742–43.[13] As

---

13. The Supreme Court stated that if the interest asserted to override the First Amendment right of access to a particular proceeding is the defendant's right to a fair trial, the hearing should be closed only if there is "a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would pre-

vent," and "reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Press–Enter. II*, 478 U.S. at 14, 106 S.Ct. at 2742. The First Amendment cannot be overcome by "the conclusory assertion that publicity might deprive the defendant of that right." *Id.* at 15, 106 S.Ct. at 2743. Here, defendant

discussed *supra,* the government has advanced three interests which it believes outweigh the right of access.[14] These interests are the privacy and reputation interests of third parties, the "investigation interest", and the policy interest of promoting liberal disclosure of *Brady* material. Without repeating its prior analysis, inasmuch as these interests were insufficient to overcome the common law presumption of access, *see supra,* they are not sufficiently "compelling" so as to overcome the First Amendment right of access. The Court therefore concludes that there is a First Amendment right of access to the Bender Documents, comprised of the four separate post-trial submissions. The News Journal's Motion to Unseal on this ground will be granted.

## IV. Summary

In *Richmond Newspapers,* Justice Brennan, in his concurring opinion, discussed the importance, purpose and function of the First Amendment and its particular relevance and role in connection with open criminal proceedings, language which was quoted by the Third Circuit appellate court in *Smith I:*

> Justice Brennan, in concurrence, argued that the First Amendment "embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government." The right of access, Justice Brennan continued, has particular weight when claimed in the context of "an enduring and vital tradition of public entree to particular proceedings or information," and the importance of access to "a particular government process" must be measured "in terms of that very process." To Justice Brennan, "Public access is essential, therefore, if trial adjudication is to achieve the objective of maintaining public confidence in the administration of justice."

*Smith I,* 776 F.2d at 1108 (quoting *Richmond Newspapers,* 448 U.S. at 587–95, 100 S.Ct. at 2837 (Brennan, J., concurring)) (emphasis in original) (citations omitted). The irrefutable wisdom of this passage has guided the Court in determining that the public, through its surrogate, the press, has a right of access to the post-trial briefs and appendix filed in support of defendant's Motion for a New Trial.

It is understandable that the Justice Department and the FBI, motivated by concerns of preserving their institutional reputations and the privacy interests of their personnel, are loath to consent to the release of unsubstantiated allegations. Nonetheless, those concerns of institutional or individual embarrassment are far outweighed by the absolute necessity of allowing the light of public scrutiny to shine brightly upon government agencies, the courts, and the judicial process, so that the citizenry may be fully informed. While potentially embarrassing and inconvenient to both governmental agencies and their personnel, it is a small price to pay for trial adjudication to "achieve the objective of maintaining public confidence in the administration of justice." *Richmond Newspapers,* 448 U.S. at 595, 100 S.Ct. at 2837 (Brennan, J., concurring).

Although firmly committed to granting the News Journal's Motion to Unseal, the Order the Court will enter today will stay the unsealing of the documents until June 10, 1996, at 10:00 a.m. This step is taken to give the government ample opportunity to seek an extension of the stay from the Third Circuit Court of Appeals.[15] Should the appellate court extend the stay pending resolution on appeal, it may wish to consider expedited consideration of the appeal because of the procedural posture of the underlying criminal case in the district court.

Specifically, the Court has set argument on defendant's Motion for a New Trial, which is

---

does not argue that his fair trial rights with respect to the Motion for a New Trial would be jeopardized. Thus, the Court need not ascertain whether this constitutional standard has been satisfied.

**14.** *See* Text, *supra* at 776–780.

**15.** At the hearing on the News Journal's Motion to Unseal, the government indicated that it intended to apply for a stay with the Third Circuit Court of Appeals if the decision were adverse to its position. *See* Transcript of Proceedings, at 59.

predicated solely upon the Bender Documents, for June 25, 1996, a date after the current expiration of the stay. Whether that hearing should be open or closed is not before this Court; nor can it technically be before the circuit court of appeals should the government seek to extend the stay. Nevertheless, should the circuit court extend the stay, the intent and spirit of that stay would be violated if this Court were to go ahead with the hearing as scheduled. Should the appellate court extend the stay, this Court will be faced with a vexing problem. Defendant is presently incarcerated and awaiting sentencing, and is entitled to a hearing and disposition on his Motion for a New Trial. While the pendency of the stay in the Third Circuit appellate court provides the government the opportunity to challenge this Order unsealing the documents, the Court is between the Scylla of timely adjudicating defendant's Motion for a New Trial in an open proceeding and the Charybdis of awaiting resolution of the merits of this Order in the appellate court. The only practical resolution of this dilemma is to postpone the argument on defendant's Motion for a New Trial until after the appellate court resolves the merits of the government's appeal of this Court's Order granting the News Journal's Motion to Unseal.

## V. Conclusion

The News Journal has a right of access under both the common law and the First Amendment to the Bender Documents. Accordingly, the News Journal's Motion to Unseal Docket Items 92, 93, 99 and 108 will be granted. The Court will also unseal Docket Item 56. An appropriate order will be entered. Contemporaneously with the entry of this order, the Court will enter an order staying the unsealing of Docket Items 92, 93, 99 and 108 until June 10, 1996, at 10:00 a.m., in order to allow the government to seek an extension of the stay in the Third Circuit Court of Appeals.