UNITED STATES of America

v.

Matthew Alexander **PORTER,** Jr., Defendant.

No. 4:CR–97–0042.

United States District Court, M.D. Pennsylvania.

Dec. 22, 1997.

Frederick E. Martin, Asst. U.S. Atty., Williamsport, PA, for U.S.

D. Toni Byrd, Asst. Fed. Public Def., Williamsport, PA, for Defendant.

*MEMORANDUM*

McCLURE, District Judge.

*BACKGROUND:*

On February 19, 1997, a grand jury sitting in the Middle District of Pennsylvania returned an indictment charging defendant Matthew Porter Alexander, Jr., with: engaging in misleading conduct toward other persons with intent to influence the testimony of other persons in an official proceeding, in violation of 18 U.S.C. § 1512(b)(1) (Count One); arson affecting interstate commerce, in violation of 18 U.S.C. § 844(I) (Count Two); use of fire to commit a federal felony, in violation of 18 U.S.C. § 844(h)(1) (Count Three); interstate transportation in aid of arson, in violation of 18 U.S.C. § 1952(a)(3) (Count Four); wire fraud, in violation of 18 U.S.C. § 1343 (Counts Five, Six); and mail fraud, in violation of 18 U.S.C. § 1341 (Counts Seven through Eleven, inclusive). On Tuesday, November 25, 1997, a jury returned a verdict of guilty as to all charges.

On Monday, November 24, 1997, the jury gave the court a message that it could not reach a verdict and, contrary to the court's instruction, indicated the vote count. That note has been unsealed by the court. Remaining sealed at this time are various motions and the orders related thereto.

On December 2, 1997, we issued an order stating that it was the court's intention to unseal the remainder of the record, as at least one member of the media has indicated that he desires access to the sealed documents. However, we permitted the parties to file objections to the unsealing.

Before the court is Porter's notice of objection to the unsealing of any of the documents remaining under seal, some 24 documents in all.

*DISCUSSION:*

*I. STATEMENT OF FACTS*

Although Porter's objection to unsealing the remaining documents is a general objection relating to his right to counsel, part of our rationale for overruling the objection is the public interest in these proceedings. That interest was created in part by Porter,

whose initial pre-trial motions raised questions of general social concern in an inflammatory manner. Moreover, Porter and his attorney gave statements to the press during the pre-trial stages of these proceedings. In order to place at least that part of our reasoning into context, as well as to provide background to the reader, the facts of the case, construed in favor of the government as the party in whose favor the verdict was returned, will be recited. However, numerous matters disputed during trial which were of only tangential relevance will be omitted.

In late October, 1994, letters were received at the three institutions [1] within the Allenwood Federal Corrections Complex, White Deer, Union County, addressed to the warden of each facility. The letters (all copies of the same letter) set forth White racist sentiments and identified "KKK" [2] as the sender. They were turned over to Special Agent Tim Childs of the Federal Bureau of Investigation either shortly after being received (for investigation of the letters themselves) or after November 21, 1994 (as part of the investigation into the fire at the Porter home).

On October 26, 1994, a copy of the same letter was received by Michael T. Warns, Chief of Police for the Borough of Milton, Pennsylvania. Chief Warns received a second letter on November 9, 1994. The text was different from the first letter, but the sentiments and the general style of the letter were similar to the first.

In 1994, Matthew Alexander Porter, Jr., who is Black, was an employee of the Federal Bureau of Prisons, assigned to the United States Penitentiary at Allenwood, within FCC–Allenwood. At the time of the fire, he was a corrections counselor in Unit I and had an office in Unit I–A. On Friday, November 18, 1994, Porter left work early to attend a school function, then left with his family for South Carolina. According to Porter's statements to the FBI, he took U.S. Route 15 south from Milton to Harrisburg, then traveled on Interstate Route 81 south. The

Porter family arrived in Spartanburg, South Carolina, at about 9:00 a.m. on the following day. Porter was due back at work the following Tuesday.

At 2:00 a.m. on Monday, November 21, 1994, Porter's immediate supervisor, Don Troutman, received a telephone call from Porter asking for time off on the following Tuesday and Wednesday to visit his sick grandmother. Porter stated that he was calling from Roanoke, Virginia. Troutman approved the request.

Before the call, unbeknownst to Troutman, the Porter home, a rented townhouse on Georgetown Lane in Milton, had begun to burn. Shortly after 1:00 a.m., neighbors became aware of the fire, notified authorities, and began to knock on doors and windows of the surrounding homes to alert others.

Investigators found that plastic trash cans at various locations in the home contained plastic bottles which in turn contained gasoline. More gasoline had been spilled on the floor of the dwelling and gasoline-soaked towels were found. No evidence of an electrical fire was found, so the Fire Marshal from the Pennsylvania State Police concluded that the fire was incendiary in nature. It was caused by the igniting of the gasoline spread throughout the structure.

After the fire was extinguished, numerous copies of the same letters sent to the wardens and Chief Warns were found in the area around the Porter house, mostly in the back of the dwelling. Those collected at the scene were turned over to S.A. Childs for FBI investigation as the fire appeared to be racially motivated arson, i .e. a "hate crime."

At about noon on November 21, Childs called Spartanburg and spoke to Porter's wife, who had already been notified of the fire. Porter was not there, so Childs asked to have his call returned, which Porter did at about 2:30 or 3:00 p.m. Porter told Childs that he had been in Atlanta the night before, and that he was still in South Carolina because he had called Troutman at 11:00 p.m.

---

1. FCC-Allenwood contains a low-security institution, a medium-security institution, and a penitentiary.

2. The court has capitalized the "KKK" in the manner in which the Ku Klux Klan generally is designated. The letters received at FCC–Allenwood and others described below are not consistent in so doing.

the night before and asked off the extra two days.

The following day, Porter was interviewed at the request of Childs by an agent in the Spartanburg office of the FBI. At that time, Porter said that he had been in Williamsport, Pennsylvania, on the night of the fire when he called Troutman. In later interviews, Porter stated that he had been in Danville, Pennsylvania, and finally Bloomsburg, Pennsylvania, at that time. There were other inconsistencies in the statements given by Porter which will not be recited at length.[3]

In December, 1994, Childs learned that Porter had purchased a second insurance policy covering the contents of his home, a "renter's policy," shortly before the fire. It was upon learning of the second policy that Porter became a suspect in the case. Both policies provided up to $30,000.00 in coverage. Also, it was learned that the letters found at the scene of the fire had been produced on a typewriter with print similar to that on the typewriter used at work by Porter and that the copies of the letters had been produced on a photocopier at USP–Allenwood. Moreover, the post-marks on the envelopes showed that the letters had been mailed either at the Milton Post Office or in mailboxes serviced through the Harrisburg sorting center.

As noted, for the sake of brevity, we have omitted a number of factual matters developed at trial, such as the circumstances of the interviews of Porter. Some of the evidence omitted was of more probative value than other evidence.[4] However, the foregoing factual recitation is sufficient for present purposes. In addition, we think a brief overview of our rulings with respect to the subpoenas and subpoenas duces tecum is appropriate for the purpose of placing the ruling embodied in this memorandum into context.

Porter's defense was that the letters received by Chief Warns and the wardens of the various institutions within FCC–Allenwood were in fact the work of White racists, and that White racists, not Porter, committed the arson. Of course, if accepted as genuine, the letters certainly would support this contention.

To support his defense, Porter sought subpoenas for a large number of persons with some knowledge of or experience with racism, both within the BOP and generally, along with supporting documentation. We concluded that not all of this evidence was "material and favorable" to the defense. That is, not every act of racism is connected, and Porter's inability to connect the evidence as to time, place, and identity of actors was fatal to his *ex parte* applications in many instances.

Porter, however, argued both in his motions and at trial that such acts are connected as evidencing a pervasive atmosphere of racism and because White supremacist groups have overlapping memberships and communicate with one another, a sort of "support system" for hate groups. Taking this argument to its logical extreme, the assassination of Martin Luther King, Jr., would be evidence that Porter did not set fire to his house. Needless to say, we felt that a more restricted view of materiality was appropriate.

---

**3.** We will provide one example, however. Porter told investigators that he had obtained renter's insurance because a co-worker's home had burned causing significant loss as there had been no coverage. The second policy, according to Porter, was obtained because he also had automobile insurance with the second company, State Farm, and wanted to get a discount for having both automobile and homeowner's insurance. However, at the time of the fire, Porter had not canceled the first policy, and State Farm did not offer discounts for multiple policies. *See also* n. 4, below.

**4.** For example, Porter told interviewers that he had stopped on the return trip and napped. Because he had been wearing his shoes for a considerable amount of time, he took them off and left them outside the car while he slept. Upon awakening, he continued his trip, forgot about the shoes, and arrived in South Carolina in his bare feet. Obviously, one can question how a driver would not notice the lack of shoes when pressing the pedals of the car. Moreover, the person who poured gasoline on the floor of the Porter house is likely to have had a considerable amount of gasoline on his shoes. Other matters such as this are omitted from the body of the factual recitation as bearing more on the credibility of the explanation offered by Porter rather than being substantive evidence.

Consistent with this determination, we allowed Porter to subpoena witnesses for the purpose of showing Klan activity in the area at or around the time of the fire. Also, we held that evidence of persons with animosity toward Porter was admissible and could be the subject of subpoenas. During trial, we limited the evidence to a six-county area around Milton within a year of the fire. Absent further evidence of a link between a racist incident and Porter or the fire, we fail to see how a reasonable jury could conclude that there was a causal relationship.

We turn next to the objections to unsealing the documents.

## II. PUBLIC ACCESS

Since neither the *forma pauperis* statute, 28 U.S.C. § 1915, nor the rule governing issuance of subpoenas for a defendant proceeding *in forma pauperis*, Fed.R.Crim.P. 17(b), sets forth a requirement that the documents remain under seal, we apply a constitutional analysis.[5] We do so because it is a member of the press who seeks access to the documents and note that such an analysis is recited in Porter's brief.

■ Historically, there has been a presumption of openness in criminal proceedings extending to the time before the Norman Conquest. *United States v. Simone*, 14 F.3d 833, 837 (3d Cir.1994)(citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 565, 100 S.Ct. 2814, 2821, 65 L.Ed.2d 973 (1980)). This right of public access, preserved in the First Amendment, may attach to various stages of criminal proceedings and not simply to trial. *Id.* (also citing *Press–Enterprise v. Superior Court of Cal.*, 464 U.S. 501, 507, 104 S.Ct. 819, 822, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I*"); *Press–Enterprise II[6] v. Superior Court of Cal.*, 478 U.S. 1, 10, 106 S.Ct. 2735, 2741, 92 L.Ed.2d 1 (1986)).

■ The analysis for determining whether documents or proceedings are subject to closure begins with a preliminary determination of whether the First Amendment attaches to the particular documents or proceedings at issue. The two-prong inquiry is known as the "experience and logic test" and was set forth by the Supreme Court in *Press–Enterprise II*, 478 U.S. at 8, 106 S.Ct. at 2740. *See also Simone* at 837; *United States v. Gonzalez*, 927 F.Supp. 768, 780–781 (D.Del.1996). The "experience" prong involves a consideration of "whether the place and process have historically been open to the press and general public." *Press–Enterprise II* at 8, 106 S.Ct. at 2740. The "logic" prong involves a consideration of "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.*

In performing the logic prong of the test, we must consider the following societal interests advanced by open court proceedings:

(1) promotion of informed discussion of governmental affairs by providing the public with the more complete understanding of the judicial system;

(2) promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings;

(3) providing a significant community therapeutic value as an outlet for community concern, hostility, and emotion;

(4) serving as a check on corrupt practices by exposing the judicial process to public scrutiny;

(5) enhancement of the performance of all involved; and

(6) discouragement of perjury.

*Gonzalez* at 782–783 (summarizing *United States v. Criden*, 675 F.2d 550, 556 (3d Cir. 1982); also citing *Simone* at 839; *United States v. Smith*, 787 F.2d 111, 114 (3d Cir.

---

**5.** Of course, if a statute or rule required the permanent sealing of a document, it would be subject to the same analysis. The difference would be that the interest embodied in or furthered by the statute or rule would be weighed against the First Amendment right of access rather than the interests proffered by the proponent of closure. *See, e.g., U.S. v. A.D.*, 28 F.3d 1353,

1361 (3d Cir.1994)(weighing public interest in access to juvenile delinquency proceedings against rehabilitative purposes of statute limiting access).

**6.** Sic. The actual caption reads, "Press–Enterprise Co."

1986)). *See also United States v. A.D.*, 28 F.3d 1353, 1357 (3d Cir.1994).

■ If the court determines that the First Amendment is applicable, the right of access is not absolute but may be outweighed by a sufficiently weighty countervailing interest:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press-Enterprise* I, 464 U.S. at 510, 104 S.Ct. at 824. *See also Simone* at 840; *Gonzalez* at 783 (test is whether there are compelling interests which overcome First Amendment right of access and whether order may be narrowly tailored to serve those interests).

## III.  EXPERIENCE AND LOGIC TEST

### A.  Experience

■ As a general rule, this court routinely unseals documents at the end of a case as the interests normally associated with closure are no longer relevant. An exception would be a case in which a protective order related to a patent or trade secret has been entered. Porter provides no information that the practice of other courts is to the contrary.

Moreover, it has been the general rule under both the common law and the Constitution that there is a right to inspect and copy public records, including judicial records and documents. *Gonzalez* at 782 (quoting *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 1311, 55 L.Ed.2d 570 (1978)); *A.D.* at 1361 n. 7.

In contrast, Fed.R.Crim.P. 17(b), governing the issuance of subpoenas by defendants proceeding *in forma pauperis*, has set forth the *ex parte* procedure employed only since 1966. *United States v. Jenkins*, 895 F.Supp. 1389, 1395 (D.Haw.1995). The stated purpose of the Rule is to prevent the unfairness of requiring a defendant to disclose a theory of the defense in an open application for subpoenas when the government is not required to make any similar disclosure. *Id.*

(citing advisory committee notes to 1966 amendment to Rule 17(b)). The Rule does not state that applications are to remain *ex parte* after trial, i.e. once the theory of the defense has been exposed.

Thus, the general rule of openness appears to apply: There is no history of closure prior to 1966. The general practice is not to maintain documents under seal, so that there is no history since 1966. And the Rule does not contain language requiring closure. The "experience" prong of the test is met.

### B.  Logic

Before considering the societal interests furthered by open court proceedings, it is important to place into context the *ex parte* motions for subpoenas and subpoenas duces tecum filed by Porter. Shortly after being arraigned, Porter filed pre-trial motions which portrayed himself as a victim of racism due both to the fire and to the prosecution. One of Porter's motions was to dismiss the indictment for selective prosecution; the motion was denied as Porter provided no evidence to substantiate the claim.

Another of Porter's motions was for a change of venue. In the motion and brief, Porter (through counsel) argued that a fair trial was impossible because the jury pool in the Middle District of Pennsylvania is saturated with racist Whites. The motion and brief were themselves replete with racist statements. The comments again appeared in a motion for transcripts of grand jury proceedings, which Porter also contended must have been tainted with racism.

In addition to the comments recited in the motion and brief, Porter gave an interview to a newspaper reporter shortly after the indictment. Karen Blackledge, *Ex-prison counselor has his say*, Lewisburg Daily Item, March 12, 1997, at C1.

These comments by Porter and his counsel came at a time when race had again become a focus of national attention due to racially motivated arsons of churches throughout the country and the overly publicized (i.e. sensationalized) murder trial of O.J. Simpson, in which Simpson was acquitted. Porter thus brought his own case to public attention, albeit on a much more limited scale.

Finally, in denying the motion for a change of venue, we noted the offensive nature of Porter's arguments, stating, "Racially derogatory remarks would not be acceptable if directed at Porter, and they are not acceptable in reverse. We make no comment on Porter's apparent defense, i.e. that unidentified Klansmen committed the arson, except that it is not to be presented in this manner." Memorandum of April 29, 1997, at 11. This comment was made long before the filing of Porter's *ex parte* motions for subpoenas.[7] Thus, the nature of the defense was hardly a secret even so early in the proceedings, at least the defense being considered, which eventually was adopted.

We turn, then, to the public interests in unsealing the remainder of the record. We find that public access to the motions for subpoenas and subpoenas duces tecum, and the orders related thereto, would promote informed discussion of governmental affairs by providing the public with a more complete understanding of the judicial system. The motions and appended exhibits show the type of evidence proffered by the defense, and our disposition of the motions is analogous to a ruling on the relevance of evidence at trial under Fed.R.Evid. 401, 403. Both such rulings are indicative of the fairness or unfairness with which the case is handled and constitute the type of information as to which there exists a right of public access to criminal proceedings. Moreover, since it is the government which bears the cost of subpoenas under Rule 17(b), the manner in which such funds are expended is brought to light. In particular, the public is assured that the court is neither arbitrarily denying a criminal

defendant his right to compulsory process nor expending public monies without adequate justification.

The foregoing recitation also applies to the second, third, fourth, and fifth societal interests in openness. Also, with respect to the third societal interest, providing a significant community therapeutic value as an outlet for community concern, hostility, and emotion, unsealing the documents in question permits an examination of Porter's requests and our ruling thereon in the context of the purported racial animosity which Porter himself raised.[8] Again, the fairness or unfairness of the proceedings can be discussed and considered thoroughly only by viewing the entirety of the proceedings and the reasons for any action taken. In so doing, negative emotion in the community hopefully will be foreclosed.

Unsealing the documents in question also serves the purpose of discouraging perjury, since a witness who knows that proffered testimony will become a matter of public record should be less likely to be untruthful.

Our analysis is similar to that set forth in *Gonzalez*, 927 F.Supp. at 783, and the reader is referred to that case as thoroughly yet succinctly setting forth the rationale we have applied. We would add that, like the documents in question in *Gonzalez*, "the cat is out of the bag" with respect to Porter's theory of the defense since it was presented at trial, and public access to the sealed documents will facilitate an informed discussion of Porter's contention that he was the victim of a state-wide conspiracy among White racists.

7. That is, the theory of the defense eventually employed was evident early on due to the nature of the motions and brief filed by Porter. At that time, the court had not been presented with the *ex parte* motions for subpoenas, so that we were not aware that a final decision would be made with respect to the defense to be presented. In addition, Porter's counsel moved to withdraw after the court ruled on the pre-trial motions, so that it was new counsel that reviewed the evidence and determined to follow the same theory of the defense. We note this to make clear that the court was not exposing a confidential communication but commenting on an obvious theory of defense.

8. We do not intend by this statement that raising the question of Porter's race was improper, though the manner in which it was raised was improper. In fact, any court should be sensitive to a question of racial prejudice in proceedings before it. Moreover, the question existed regardless of Porter's motions, brief and statement to the press due to the fact that the racist literature was left at the scene of the fire. We refer instead to the extent of the debate and the position or contentions adopted by Porter which the public has a right to view in the context of the circumstances of the case as a whole, i.e. not Porter's claims of unfairness standing alone. The public's view, if the documents remain sealed, necessarily would be slanted.

The "logic" prong of the test is met, and we conclude that the First Amendment applies to documents sealed pursuant to the *ex parte* procedure set forth in Fed.R.Crim.P. 17(b).

## IV. FIRST AMENDMENT ANALYSIS

We turn then to the First Amendment analysis as recited above: whether sealing the documents is essential to preserve "higher values" or "compelling interests" which closure is "narrowly tailored" to serve. Porter posits two interests served by closure: that the *ex parte* applications constitute attorney work product, and the fact that counsel for a non-indigent defendant would not be required to disclose the reasoning behind issuance of a subpoena.

■ The first argument is of little substance and is refuted by the case cited by Porter. The Third Circuit therein recited:

[T]he work-product doctrine promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients. *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947); *United States v. AT & T*, 642 F.2d 1285, 1299 (D.C.Cir. 1980).

*Westinghouse v. Republic of the Philippines*, 951 F.2d 1414, 1428 (3d Cir.1991) (parallel citations omitted; "DC" cited as in original). Documents filed with the court are not prepared "in anticipation of litigation"; they are part of the litigation. Under Porter's view, any document filed with the court which is not provided to an adversary is attorney work product and subject to confidentiality, a notion in direct contrast to the long history of open access to court documents. We decline to expand the attorney work product doctrine in this manner.

■ Of more substance is Porter's argument that the unsealing of the *ex parte* applications makes an unfair distinction between indigent and non-indigent defendants. On closer examination, however, it is not an unfair distinction for two reasons: there is a logical basis for the unsealing, and there is no practical distinction.

■ We begin with the fact that an indigent defendant is not entitled to all of the rights which may be expected by a defendant who has the means to hire his or her own attorney. For instance, an indigent defendant has the right to the appointment of counsel, but does not have the right to counsel of choice or to any special relationship with appointed counsel. *United States v. Jennings*, 855 F.Supp. 1427, 1441 (M.D.Pa. 1994), *aff'd*, 61 F.3d 897 (3d Cir.1995) (table). There are limitations on the amount of money to be spent on representation. 18 U.S.C. § 3006A(d)(2). Counsel must submit to the court an itemized bill for services and an explanation of why the services rendered were reasonable. 18 U.S.C. § 3006A(d)(5). Moreover, there are limits on the availability of services other than counsel and the amount of money which may be expended for such services. 18 U.S.C. § 3006A(e).[9] Neither the Constitution nor the relevant statutory scheme requires that an indigent defendant be provided with the equivalent of privately retained counsel.

In contrast, the public has a right to know both that the attorney for which it is paying is performing the task for which funds are expended and that the defendant is being given a fair trial by the court. This assessment can be made only through examination of the motions filed and ruled-on by the court. The interest stems both from the fact that the public is paying for the attorney and the fact that the public always has an interest in the proper administration of justice.

Further contrast is reflected in the short history of Rule 17(b) in its present form, which demonstrates that an indigent defendant has not always been entitled to the privacy which Porter seeks. More importantly, Rule 17(b) protects the theory of the defense from pre-trial disclosure so that the

---

9. Amounts paid for representation by appointed counsel and for services other than counsel must be made available to the public. 18 U.S.C. § 3006A(d)(4), (e)(4).

government is not given the unfair advantage of being able to "head off" the defense by preparing evidence to foreclose or rebut the defense, an opportunity not available to the defense. Thus, Rule 17(b) embodies not so much a privacy interest as a procedure to ensure the fairness of the trial, an interest which does not extend beyond the trial.

Thus, there is a distinction between counsel privately retained and counsel appointed by the court: the rights appurtenant to the right to counsel are more limited when counsel is appointed, and practical considerations further limit the confidentiality of the relationship when counsel is appointed.

As to the second reason for rejecting Porter's "higher value," we find that the disclosure of appointed counsel's reasons for desiring subpoenas of witnesses or documents is a distinction without a difference. A defendant with privately retained counsel who serves a subpoena still must offer the testimony or other evidence at trial, and bears the burden of establishing the relevance and probative value of the proffered evidence under Rules 401, 403. Thus, counsel's thought process is no more subject to disclosure when appointed by the court than when retained by the defendant. The only difference is the point in time at which a ruling is made, i.e. before or after expending funds to bring a witness or evidence before the court.

■ We conclude that an indigent defendant's purported privacy interest in counsel's view of the case does not outweigh the public's right of access to judicial documents. Having so determined, we do not reach the question of whether a closure order would be narrowly tailored to further that interest.

## V.  CONCLUSION

The First Amendment to the Constitution of the United States is implicated by Porter's objections to the unsealing of the *ex parte* portion of the record in this case. However, the right to public access outweighs any interest on the part of Porter to having the record remain sealed. We will deny Porter's

objections and direct the clerk to unseal the remaining documents.